Lee A. Weiss
lweiss@dreierllp.com
Rebecca Tingey
rtingey@dreierllp.com
**DREIER LLP**
499 Park Avenue
New York, NY 10022
Phone: (212) 328-6100
Fax: (212) 328-6101

Paul R. Kiesel (SBN 119854)
kiesel@kbla.com
Patrick DeBlase (SBN 167138)
deblase@kbla.com
Michael C. Eyerly (SBN 178693)
eyerly@kbla.com
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Blvd.
Beverly Hills, CA 90211
Phone: (310) 854-4444
Fax: (310) 854-0812

David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, CA 91356
Phone: (818) 961-2000
Fax: (818) 867-4820

Attorneys for Plaintiffs and all others similarly situated

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| ELVIN and PHYLLIS VALENZUELA , individually and on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2, AMERICAN HOME MORTGAGE SECURITIES LLC, WELLS FARGO BANK, N.A., DEUTSCHE BANK NATIONAL TRUST COMPANY and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR**:<br><br>**(1)** **Violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*;**<br>**(2)** **Violation of Bus. & Prof. Code § 17200, *et seq.* - "Unlawful" Business Practices (TILA);**<br>**(3)** **Fraudulent Omissions;**<br>**(4)** **Violation of Bus. & Prof. Code § 17200, *et seq.* – "Unfair" and "Fraudulent" Business Practices;**<br>**(5)** **Breach of Contract; and**<br>**(6)** **Tortious Breach of the Covenant of Good Faith and Fair Dealing.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Elvin and Phyllis Valenzuela on behalf of themselves and all others similarly situated (collectively "Plaintiffs") allege as follows:

## I.    INTRODUCTION

1.    This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.SC. § 1601, *et seq*.; California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*. ("UCL"); and other statutory and common law in effect.  Plaintiffs bring this action against Defendants American Home Mortgage Investment Trust 2005-2, American Home Mortgage Securities LLC, Wells Fargo Bank, N.A., Deutsche Bank National Trust Company and Does 1 through 10 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiffs and Class members, in Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in the required disclosure statements accompanying the loans, (i) the actual interest rate on the loans, as required by 12 C.F.R. § 226.18; (ii) that payments on the loans made according to the payment schedule provided by Defendants will result in negative amortization and that the principal balance on the loans will therefore increase, as required by 12 C.F.R. § 226.19; and (iii) that the initial interest rate provided was discounted and did not reflect the actual interest that Plaintiffs and Class members would be paying on the loans, as required by 12 C.F.R. § 226.19.

2.    By this action, Plaintiffs seek to obtain for themselves and for a Class of similarly situated persons the remedies afforded to them by TILA and other laws.

## II.    THE PARTIES

3.    Plaintiffs Elvin and Phyllis Valenzuela, are, and at all relevant times to this Complaint were, residents of Visalia, California.  On or about June 23, 2005, Plaintiffs refinanced their existing home loan and entered into an Option ARM loan agreement with American Home Mortgage Acceptance, Inc.[1]  The Option ARM loan was secured by Plaintiffs' primary residence. Attached hereto as Exhibit 1 is a true and correct copy of the Note and Truth in Lending Disclosure Statement ("TILDS") pertinent to this action.

---

[1]  American Home Mortgage Acceptance, Inc. filed a Chapter 11 bankruptcy petition in United States Bankruptcy Court for the District of Delaware on August 6, 2007, which automatically stays any litigation against the company. Accordingly, Plaintiffs have not named American Home Mortgage Acceptance, Inc. as a defendant in this Complaint.

4.      Defendant American Home Mortgage Investment Trust 2005-2 (the "Trust") is a Delaware statutory trust that presently owns Option ARM loans that are the subject of this Complaint, including Option ARM loans originated, recorded and held in Tulare County.  The Trust has significant contacts with Tulare County, California, and the activities complained of herein occurred, in whole or in part, in Tulare County, California.

5.      Defendant American Home Mortgage Securities LLC is a Delaware company doing business in California at all relevant times.  At all times relevant hereto, American Home Mortgage Securities LLC was and is engaged in the business of purchasing, packaging and securitizing the Option ARM loans that are the subject of this Complaint, including in Tulare County.  American Home Mortgage Securities LLC owned the Option ARM loans that are the subject of this Complaint after it purchased them from American Home Mortgage Acceptance, Inc.  American Home Mortgage Securities LLC transacts business in Tulare County, California and at all relevant times purchased, packaged and securitized Option ARM loans throughout the United States, including Tulare County, California.  American Home Mortgage Securities LLC has significant contacts with Tulare County, California, and the activities complained of herein occurred, in whole or in part, in Tulare County, California.

6.      Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a Delaware corporation doing business in California at all relevant times.  At all relevant times hereto Wells Fargo was and is engaged in the business of servicing the Option ARM loans that are the subject of this Complaint.  Wells Fargo transacts business in Tulare County, California and at all relevant times serviced Option ARM loans throughout the United States, including in Tulare County, California.  Wells Fargo has significant contacts with Tulare County, California, and the activities complained of herein occurred, in whole or in part, in Tulare County, California.

7.      Defendant Deutsche Bank National Trust Company (the 'Trustee") is the Trustee of American Home Mortgage Investment Trust 2005-2.  The Option ARM loans that are the subject of this Complaint and all rights and interest under those loans were assigned to the Trustee by American Home Mortgage Securities LLC.

8.      At all times mentioned herein, Defendants, and each of them, were engaged in the business of distributing, selling, purchasing, owning and/or servicing the Option ARM loans that are the subject of this Complaint.

9.      Plaintiffs are informed, believe, and thereon allege, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

10.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants (both named and Doe defendants) sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendants.

11.     At all times herein mentioned, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

12.     Plaintiffs are informed, believe, and thereon allege, that Defendants and each of them, at all material times relevant to this Complaint, performed the acts alleged herein and/or otherwise conducted business in California. Defendants, and each of them, are corporations or other business entities, form unknown, have, and are doing business in this judicial district.

13.     Plaintiffs are informed, believe, and thereon allege, that Does 1 through 10, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the loans which are the subject of this action. Plaintiffs allege, on information and belief, that each Doe Defendant is responsible for the actions herein alleged.

The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 4 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

14.    Plaintiffs are informed, believe, and thereon allege, that at all times relevant during the liability period, Defendants, and each of them, including without limitation those Defendants herein sued as Does, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

### III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1601, *et seq.* and 28 U.S.C. § 1331.

16.    This Court has personal jurisdiction over the parties in this action by the fact that Defendants reside in this District or are licensed to do and do business in California.

17.    Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District and because there is personal jurisdiction in this district over the named Defendants because they regularly conduct business in this judicial district.

### IV.    FACTS COMMON TO ALL CAUSES OF ACTION

18.    The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiffs and Class members, in writing, as required by law.

19.    This action also concerns Defendants' unlawful, fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept Option ARM loans in order to maximize

Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

20.    Plaintiffs, along with thousands of other similarly situated consumers, were sold an Option ARM home loan by Defendants.  The Option ARM loan sold to Plaintiffs and Class members is a deceptively devised financial product.  The loan has a variable rate feature with payment caps.  The product was sold based on the promise of a low fixed payment resulting from a prominently featured low interest rate.  In fact, Plaintiffs and Class members were charged a different, much greater interest rate than promised.  Further, Defendants disguised from Plaintiffs and Class members that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.  Further still, once lured into these loans, consumers could not easily extricate themselves from the loans because Defendants included in the loans a stiff and onerous prepayment penalty making it extremely difficult, if not impossible, for borrowers to pay off the loans.

21.    The methods used by Defendants to sell the Option ARM loans to Plaintiffs and Class members violate TILA.  TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to borrowers concerning the terms and conditions of their home loans.  Defendants failed to make these disclosures in connection with the Option ARM loans sold to Plaintiffs and the Class.

22.    At all relevant times, Defendants sold their Option ARM loan to consumers, including Plaintiffs, in a false or deceptive manner.  Defendants represented to the general public that their Option ARM loan would provide a very low, fixed interest rate for a period of three to five years and no negative amortization.  Defendants used this "teaser" rate to lure Plaintiffs into purchasing Defendants' Option ARM loan.  However, the low fixed rate was illusory -- a false promise.  Plaintiffs and others similarly situated did not receive the benefit of the low rate promised to them.  Once signed on to Defendants' loan, the interest rate applied to Plaintiffs' and Class members' loans was immediately and significantly increased.

23.    Plaintiffs and others similarly situated were consumers who applied for a mortgage loan through Defendants.  During the loan application process, in each case, Defendants represented

to Plaintiffs and Class members that in accepting these loan terms, they would be able to lower their mortgage payments and save money. Defendants initiated this scheme in order to maximize the amount of loans it sold to consumers and to maximize their profits.

24.   Based on Defendants' representations, and the misconduct alleged herein, Plaintiffs and Class members agreed to finance their primary residences through Defendants' Option ARM loan. Plaintiffs and Class members were told they were being sold a home loan with a low interest rate of between 1% and 3% (the "teaser" rate), and that the interest rate was fixed for the first three to five years of the loan. Defendants also informed Plaintiffs, and Plaintiffs were led to believe, that if they made payments based on the promised low interest rate, which were the payments reflected in the written payment schedule provided to them by Defendants, that the loan was a no negative amortization home loan. Plaintiffs' payments were to be applied to their principal loan balance as well as interest.

25.   After the purported three to five year fixed interest period, Plaintiffs and Class members reasonably believed, based on the representations contained in the documents Defendants provided to Plaintiffs and Class members, that they would be able to refinance their loans and obtain a new loan before their scheduled payments increased. However, the payment schedule provided by Defendants failed to disclose to, and by omission failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiffs and Class members would be unable to refinance their loans as there would be little or no equity left to refinance, and indeed, the principal balance owed on the loan would be more than Plaintiffs had originally borrowed.

26.   Plaintiffs believed these facts to be true because that is what the Defendants wanted consumers to believe. Defendants aggressively positioned their product as a fixed, low interest home loan. Defendants knew that if it was positioned in such a manner, their Option ARM loan would be a hugely popular and profitable product for them. Defendants also knew, however, that they were selling the product in a false and deceptive manner. While Defendants trumpeted the low rate loans to the public, Defendants knew their promise of a low interest rate was illusory.

27.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate.  Unbeknownst to Plaintiffs and Class members, the actual interest rate they were charged on their loans was not fixed, was not the low teaser interest rate stated in the loan documentation, and was in fact considerably higher than going market rates.  And after purchasing Defendants' Option ARM loan product, Plaintiffs and Class members did not actually receive the benefit of the low teaser rate at all in some cases, or at best, they received that rate for only a single month.  Immediately thereafter, Defendants in every instance and for every loan, increased the interest rate they charged to consumers.  The now-increased interest charges incurred by Plaintiffs and Class members over and above the fixed interest payment rate were added to the principal balance on their home loans in ever increasing increments, substantially reducing the equity in these borrowers' homes.

28.    In stark contrast to this reality, Defendants, through the standardized loan documents they created and supplied to Plaintiffs and Class members, stated that negative amortization was only a mere possibility.  Defendants concealed and failed to disclose to Plaintiffs and the Class the fact that the loan, as presented and designed, in fact, *guaranteed* negative amortization.  Defendants failed to disclose and omitted the objectively material fact that negative amortization was absolutely certain to occur if consumers followed the payment schedule listed by Defendants in the TILDS.  This information was objectively material and necessary for consumers to make an informed decision because this would have revealed that the loan's principal balance would increase if the payment schedule was followed, thereby rendering it impossible to refinance the loan at or around the time the prepayment penalty expired and/or by the time the interest and payment rates re-set.   In this respect, Defendants utterly failed to place any warning on the TILDS about negative amortization.

29.    At all relevant times, once Plaintiffs and Class members accepted Defendants' Option ARM loan contract, they had no viable option by which to extricate themselves because these Option ARM loan agreements included a draconian pre-payment penalty for a period of up to three years.

30.     The Option ARM loans sold by Defendants all have the following uniform characteristics:

(a)     There is an initial low interest rate or "teaser" rate that was used to entice the borrower into entering into the loan.  The rate offered was typically 1% - 3%;

(b)     The loan has a corresponding low payment schedule.  The documentation provided intended to misleadingly portray to consumers that the low payments for the first several years were a direct result of the low interest rate being offered;

(c)     The initial payments in the required disclosures were precisely the amount that would be required to pay both interest and principal in a fully amortized 30 year loan based upon the low interest rate being offered.  The purpose was to assure that if someone were to calculate what the payment would be at the low offered interest rate, it corresponded to the payment schedule.  This portrayal was intended to further mislead consumers into believing that the payments were enough to cover all principal and interest;

(d)     The payment has a capped annual increase on the payment amount; and

(e)     A substantial number of the loans include a prepayment penalty preventing consumers from securing a new loan for a period of up to three years.

31.     Defendants uniformly failed to disclose to, and by omission, failed inform to consumers, including Plaintiffs and Class members, in a clear and conspicuous manner that the "teaser" rate offered by Defendants was actually a discounted rate and only applied to the loans for thirty (30) days.  Thereafter, the true interest charged on the loans was significantly higher than the promised rate.

32.     Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiffs and Class members, that the payments set forth in the TILDS were insufficient to cover the actual charges and that this was, in fact, a loan that would cause Plaintiffs and Class members to lose the equity they had in their homes.

33.     Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiffs and Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

34.    Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is a loss of equity.  Defendants, and each of them, are, and at all relevant times hereto have been, aware that clear and conspicuous disclosure of the actual interest rate and a payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important, material information.

35.    At all relevant times, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiffs and Class members was insufficient to pay both interest and principal; (ii) that negative amortization was substantially certain to occur if Plaintiffs and Class members made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' and Class members' residences was substantially certain to occur if Plaintiffs and Class members made payments according to the payment schedule provided by Defendants.

36.    In spite of their knowledge, Defendants sold their Option ARM loans as a product that would provide Plaintiffs and Class members with a low interest rate for the first three to five years of the loan, and at all relevant times, failed to disclose and/or concealed this information by making partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.  This concealed and omitted information was not known to Plaintiffs and Class members.  Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note and the payment amounts set forth by Defendants were insufficient to pay both principal and interest, negative amortization occurred.

37.    The true facts about Defendants' Option ARM loans are that they do not provide the low interest rate promised and they are certain to result in negative amortization.

38.    Disclosure of a payment rate that is sufficient to pay both principal and interest on the loans is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur.  Defendants, and each of them are, and at all relevant times have been, aware that the

1  ability of the disclosed payment rate to pay both principal and interest so as to avoid negative

2  amortization is one of the most important terms of a loan.

3        39.    To this day, Defendants continue to conceal material information from consumers

4  and the public that: (i) the payment amounts on the payment schedules provided to Plaintiffs and

5  Class members are and were insufficient to pay both principal and interest; (ii) if the disclosed

6  payment schedule is followed, Plaintiffs and Class members will suffer negative amortization; and

7  (iii) loss of equity and/or loss of the property is substantially certain to occur if the disclosed

8  payment schedule is followed.  Nevertheless, Defendants have refused to clearly and conspicuously

9  disclose to Plaintiffs and Class members the existence of this important material information and

10  the injury caused thereby, including but not limited to the loss of equity.

11        40.    In the end, the harm caused by Defendants' failures to disclose and omissions, as

12  alleged herein, grossly outweighs any benefit that could be attributed to them.

13        41.    Knowing the truth and motivated by profit and market share, Defendants knowingly

14  and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff and all others

15  similarly situated.

16        42.    Defendants' failures of disclosure regarding their Option ARM loans have resulted

17  and will continue to result in significant loss and damage to Plaintiffs and Class members, including

18  but not limited to the loss of equity these consumers have or had in their homes.

19        43.    The facts which Defendants misrepresented and concealed, as alleged in the

20  preceding paragraphs, were material to the decisions about whether to purchase Option ARM loans

21  in that Plaintiffs and Class members would not have purchased these loans but for Defendants'

22  unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

23        44.    Defendants' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or

24  practices were committed with willful and wanton disregard for whether or not Plaintiffs and Class

25  members would receive a home loan that would actually provide the low interest and payment rate,

26  as promised, for the first three to five years of the loan that would be sufficient to pay both principal

27  and interest.

28

45.     Upon information and belief, at all relevant times during the liability period, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and nevertheless sold these Option ARM loans throughout the United States, including in the State of California.

## V.      CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), and 23(b), and the case law thereunder.  The class Plaintiffs seek to represent is defined as follows:

> All individuals in the United States of America who, within the four
> year period preceding the filing of Plaintiffs' Complaint through the
> date notice is mailed to the Class, received an Option ARM loan
> through American Home Mortgage Acceptance, Inc. on their primary
> residence located in the United States of America.  Excluded from the
> Class are Defendants' employees, officers, directors, agents,
> representatives, and their family members.

> An appropriate sub-Class exists for the following Class members:
> All individuals in the United States of America who, within the three
> year period preceding the filing of Plaintiffs' Complaint through the
> date notice is mailed to the Class, received an Option ARM loan
> through American Home Mortgage Acceptance, Inc. on their primary
> residence located in the United States of America.  Excluded from the
> sub-Class are Defendants' employees, officers, directors, agents,
> representatives, and their family members.

47.     Plaintiffs reserve the right to amend or otherwise alter the definitions of the Class presented to the Court at the appropriate time, or propose or eliminate sub-Classes in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

48.    <u>Numerosity</u>:  The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the Class consists of thousands of members.

49.    <u>Commonality</u>: Common questions of law or fact are shared by members of the Class.  This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

(1)    Whether Defendants' acts and practices violate the Truth in Lending Act 15 U.S.C. § 1601, *et seq.*;

(2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)    Whether Defendants engaged in unfair business practices aimed at deceiving Plaintiffs and Class members before and during the loan application process;

(5)    Whether Defendants, by and through their officers, employees, and agents failed to disclose that the interest rate actually charged on these loans was higher than the rate represented and promised to Plaintiffs and Class members;

(6)    Whether Defendants, by and through their officers, employees and agents concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under TILA;

(7)    Whether Defendants failed to disclose the true variable nature of interest rates on adjustable rate mortgage loans and adjustable rate home equity loans;

(8)    Whether Defendants failed to properly disclose the process by which negative amortization occurs, ultimately resulting in the recasting of the payment structure over the remaining lifetime of the loans;

(9)    Whether Defendants' failure to apply Plaintiffs' and Class members' payments to principal as promised in the form Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(10)    Whether Defendants' conduct in immediately raising the interest rate on consumers' loans so that no payments were made to the principal balance constitutes a breach of the covenant of good faith and fair dealing;

(11)    Whether Defendants' scheme misleadingly portrayed or implied that these loans were fixed rate loans, when Defendants knew that only the periodic payments were fixed (for a time) but that interest rates were not "fixed;"

(12)    Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable;

(13)    Whether Plaintiffs and the Class are entitled to damages;

(14)    Whether Plaintiffs and the Class are entitled to punitive damages; and

(15)    Whether Plaintiffs and the Class are entitled to rescission.

50.    Typicality:  Plaintiffs' claims are typical of the claims of Class members.  Plaintiffs and Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and Class members are based on the same legal theories.

51.    Adequacy:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend to prosecute this action vigorously.   The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

52.    Ascertainable Class:  The proposed Class is ascertainable in that the members can be identified and located using information contained in Defendants' records.

53.    This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

(a)    Risk of Inconsistent Judgments: The unlawful acts and practices of Defendants, as alleged herein, constitute a course of conduct common to Plaintiffs and each Class

member.  Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of individual Class members to protect their interests;

(b)     Injunctive and/or Declaratory Relief to the Class is Appropriate:  Defendants, and each of them, have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the Class as a whole appropriate; and

(c)     Predominant Questions of Law or Fact:  Questions of law or fact common to Class members, including those identified above, predominate over questions affecting only individual Class members, if any, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.   Further, an important public interest will be served by addressing the matter as a class action.  The cost to the court system of adjudicating each such individual lawsuit would be substantial.

## VI.     FIRST CAUSE OF ACTION

### VIOLATIONS OF TRUTH IN LENDING LAWS, 15 U.S.C. § 1601, *et seq.*

**(Against Defendants American Home Mortgage Investment Trust 2005-2, American Home Mortgage Securities LLC, Deutsche Bank National Trust Company and Does 1-10)**

54.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

55.     15 U.S.C. § 1601, *et seq.*, is the Federal Truth in Lending Act ("TILA").  The Federal Reserve Board of Governors implements TILA through Regulation Z (12 C.F.R. § 226 ) and its Official Staff Commentary ("FRB Commentary").  Compliance by lenders with Regulation Z became mandatory on October 1, 1982.  Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

56.     The purpose of TILA is to protect consumers.  This is stated in 12 C.F.R. § 226.1, which reads:

> **§ 226.1 Authority, purpose, coverage, organization, enforcement**
> **and liability. . .**
>
> (a)     Purpose.  The purpose of this regulation is to promote the
> informed use of consumer credit by requiring disclosures about its
> terms and costs.  The regulation also gives consumers the right to
> cancel certain credit transactions that involve a lien on a consumer's
> principal dwelling . . .

57.     Regulation Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendants, must comply:

> **§  226.17. General disclosure requirements.**
>
> (a)     Form of disclosures. (1) The creditor shall make the disclosures required by
> this subpart clearly and conspicuously in writing, in a form that the consumer may
> keep. The disclosures shall be grouped together, shall be segregated from everything
> else, and shall not contain any information not directly related to the disclosures
> required under § 226.18.

58.     The purpose of TILA is to assure meaningful disclosure of credit terms so that borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect consumers against inaccurate and unfair credit billing practices.

59.     Defendants' Option ARM loan violates TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and FRB Commentary.  Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs and Class members as Defendants were required to do under TILA. These violations are apparent on the face of the Note, the TILDS and other loan documents.

60.     The TILA violations committed by Defendants are more specifically detailed as follows:

**A.    Defendants' Failure to Clearly and Conspicuously Disclose A Single APR Violates Truth in Lending Laws**

61.    15 U.S.C. § 1638(a)(4) requires lenders to disclose only one annual percentage rate ("APR") and not an additional APR that is only applicable for the first 30 days of a loan.

62.    FRB Commentary to 12 C.F.R. § 226.17(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

63.    15 U.S.C. § 1638(a)(8) and 12 C.F.R. § 226.18(e) also require lenders to provide a descriptive explanation of the APR.

64.    12 C.F.R. § 226.18(e) defines "APR" as the cost of credit expressed as a yearly rate.

65.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require lenders to make disclosures concerning the APR in a clear and conspicuous manner and a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

66.    In addition, FRB Commentary to § 226.17(a)(1)-1 provides that TILA's clear and conspicuous requirement applies to the disclosure and explanation of the cost of the loan as an APR, and where there is a contradiction between the TILDS and other information provided to the borrower, the disclosure is unclear.

67.    At all relevant times during the liability period, Defendants provided Plaintiffs and Class members with Notes that state, at 2(A), "I will pay interest at a ***yearly rate*** of 1.000%." However, in the TILDS, in the box entitled "ANNUAL PERCENTAGE RATE" it describes the APR as "[t]he cost of your credit as a ***yearly rate***" and then lists an APR of "6.067%."  (emphasis added).

68.    At all relevant times during the liability period, Defendants violated 12 C.F.R. § 226.17(a)(1)-1 by listing two completely different APRs in the loan documents.  In particular, for Plaintiffs, the TILDS lists an APR of 6.067%, while the Note lists an APR of "1.000%."

69.    At all relevant times during the liability period, Defendants failed to clearly and conspicuously explain in the Note or TILDS that the low APR (the same APR upon which

Defendants based the written payment schedule provided to Plaintiffs and Class members) was only offered for the first thirty days of the loan.

70.    At all relevant times during the liability period, Defendants also failed to clearly, conspicuously and accurately disclose the APR that they charged Plaintiffs and Class members on their loans.  Defendants also failed to disclose to, and by omission, failed to inform Plaintiffs and Class members that the APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the very same TILDS; rather, Defendants listed payments amounts for the first five years of the loan based on the APR listed in the Note which was correct for *only* thirty days.

71.    At all relevant times during the liability period, Defendants created and caused the contradiction in the loan documents they provided to Plaintiffs and Class members by purposefully disclosing two different APRs.

**B.    Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the APR Stated in the TILDS Violates TILA**

72.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the annual interest rate and payments in a clear and conspicuous manner.  Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

73.    As for Plaintiffs' and Class members' Option ARM loans, Defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 in that they failed to clearly and conspicuously disclose the annual interest rate upon which the payments listed in the TILDS are based.

74.    The scheduled payment amounts and APR listed in the Note and TILDS for each of the subject loans are unclear and inconspicuous.  In fact, the payment amounts for the first three to five years are not based on the APR listed in the TILDS but instead, were based upon an APR listed in the Note that existed for only thirty days.

75.    At all relevant times, Defendants knowingly and intentionally included in each of the TILDS a schedule of payments which was not based upon the interest rate listed in these same documents.  Defendants' failure to clearly and conspicuously disclose the payment amounts due based on the listed APR was, and is deceptive.

76. Worse still, the other documents and representations supplied by Defendants expressly and/or impliedly represented that Plaintiffs' payments would be applied to both principal and interest. That suggested that the payments listed on the TILDS were consistent with the interest rate actually applicable to the loan, when they in fact were not. In truth, if Plaintiffs made payments according to the schedule provided in the TILDS, the payments were guaranteed to be insufficient to pay the principal and interest on the loan and, thus, negative amortization was not just a mere possibility, it was an absolute certainty.

77. At all relevant times, Defendants failed to clearly and conspicuously disclose to Plaintiffs and Class members that if they made payments according to the payment schedule set forth in the TILDS, negative amortization was not just a mere possibility, it was an absolute certainty.

78. At all relevant times, Defendants purposefully and intentionally failed to disclose to Plaintiffs and Class members, the interest rate upon which the payment schedule was based and thereby misled Plaintiffs and Class members into believing that they would be getting a loan with a low fixed payment rate that would be sufficient to pay both interest and principal.

79. At all relevant times, the payment amount provided by Defendants was intended to and did deceive consumers into falsely believing that they would receive the low interest rate upon which the payment schedule is based. While the Note states the amount of Plaintiffs' initial monthly payment, the initial monthly payment amounts stated in the Note and TILDS are not in any way related to the interest rate listed in the Note and TILDS.

80. Defendants employed the aforementioned bait-and-switch tactics on a common and uniform class-wide basis. In particular, had Defendants clearly and conspicuously disclosed a payment amount sufficient to cover both principal and interest, the payment amounts would have been almost double the payment amounts listed.

81. The TILDS is also deceptive for much the same reason. The TILDS list a schedule of payments, yet for up to five years the listed payment amounts have no relation to, and are also not based on, the annual interest rate listed in the TILDS.

82.     At all relevant times, Defendants failed to clearly, conspicuously, and accurately disclose a payment amount that corresponds to the APR being charged on the loan and that was sufficient to pay the true costs of the loan.  Plaintiffs and Class members reasonably believed that if they made the payments according to Defendants' payment schedule, the payments would, in fact, be paying off the loan.   However, the true fact is that the payment amounts stated in Defendants' payment schedule did not include any principal on the loans at all and only covered a portion of the interest Defendants were charging on these loans.

83.     FRB Commentary to 12 C.F.R. § 226.17(a)(1) states that "this standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, *the disclosures must be presented in a way that does not obscure the relationship of the terms to each other…*"  (emphasis added).

84.     At all relevant times, Defendants' Option ARM loans violated 12 C.F.R. § 226.17(a)(1) in that the amount of the payments, for the first several years of the loan term, bear no relationship to the interest rate listed in the TILDS.  Therefore, as a direct and proximate result, the form of disclosure used by Defendants obscured the relationship between the interest rate listed in the Note(s) and TILDS and the payment schedule provided.

**C.     Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization Violates the Truth in Lending Laws**

85.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans:

Certain residential mortgage and variable-rate transactions. . .

(b) Certain variable-rate transactions. If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . . (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance*

*including, for example, an explanation of interest rate or payment*

*limitations, negative amortization, and interest rate carryover.*

(emphasis added.)

86.    The negative amortization disclosure is required and must be made clearly and conspicuously, and done in a manner that does not obscure its significance.  The disclosure must state whether the loan and payments established under the terms dictated by the lender is a negative amortizing loan.

87.    In 1995, and continuing each time new FRB Commentary was issued, the Federal Reserve Board made clear that when the loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, the disclosure requires a definitive statement about negative amortization:

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Monday, April 3, 1995

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

"For the program that gives the borrower an option to cap monthly

payments, the creditor must fully disclose the rules relating to the

payment cap option, including the effects of exercising it (such as

**negative amortization occurs** and that the principal balance **will**

**increase**" (Found at C.F.R. § 226.19) (emphasis added).

88.    At all relevant times, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with FRB Commentary as well as Regulation Z and TILA.

89.    The loans sold to Plaintiffs and Class members are Option ARM loans which have a variable rate feature with payment caps.  Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiffs and Class members followed the payment schedule provided by Defendants.

90.     In fact, the only place in the Note where Defendants even inferentially reference negative amortization caused Plaintiffs and Class members to believe that negative amortization is only a mere possibility, rather than an absolute certainty.  In fact, these loans were designed in such a way so as to make negative amortization an absolute certainty.  And even when a separate explanation was provided, Defendants omitted the important material fact that these loans and payment schedules would, in fact, guarantee negative amortization.

91.     Defendants' statement in the Note at ¶ 4(G) "my monthly payment *could* be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe …" was an artfully contrived half-truth and did not alert or inform Plaintiffs or Class members that the payment schedule would absolutely guarantee that negative amortization was going to occur on these loans.  Rather, Defendants made it appear that as long as the payments were made according to the schedule listed in the TILDS, there would be no negative amortization.

92.     Defendants' statements in the Note, TILDS, and any other disclosures they provided, described negative amortization as only a mere possibility, and therefore were misleading, deceptive and inconsistent with the requirements of TILA.

**D.      Defendants' Failure to Clearly and Conspicuously Disclose The Legal Obligation Violates Truth in Lending Laws**

93.     12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."

94.     The FRB Commentary to 12 C.F.R. § 226.17(c)(1) requires that:  "[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction. In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided."

95.     This Commentary further states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

96.    The FRB Commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the agreement."

97.    At all relevant times during the liability period, Defendants' Option ARM loans violated 12 C.F.R. § 226.17(c) in that the Note and TILDS did not disclose, and by omission failed to disclose, the amounts that Plaintiffs and Class members were legally obligated to pay.  In particular, borrowers' monthly obligations to Defendants (*i.e.,* the amount charged to them each month under the Note) were much higher than Defendants' disclosures indicated.  Defendants accomplished this deception by only listing a partial payment in the TILDS, rather than a payment amount that was sufficient to pay what these borrowers were being charged for their loans and were legally obligated to pay.

98.    As a direct and proximate result of Defendants' omissions and failures to clearly and conspicuously disclose Plaintiffs' and Class members' legal obligations under the loans, Defendants took the partial payments and secretly added the deficit, each month, to principal, thereby causing negative amortization to occur.

**E.    Defendants' Failure to Disclose the Composite APR Violates Truth in Lending Laws**

99.    Defendants provided Plaintiffs and Class members with multiple, conflicting annual interest rates when describing the costs of this loan.  On the TILDS, Defendants set forth one annual interest rate, while on the Note, Defendants set forth a different annual interest rate.

100.    FRB Commentary to 12 C.F.R. § 226.17(c)(6) requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."  It also provides that "in a variable rate transaction with a . . . discounted or premium rate, ***disclosures should not be based solely on the initial terms***. In those transactions, ***the disclosed annual percentage rate should be a composite rate*** based on the rate in effect during the initial period and the rate that is the basis of the variable rate feature for the remainder of the term." (emphasis added).

101.    The reason for this requirement is clear.  Consumers cannot make an informed decision when they cannot compare the cost of credit to other proposals.  It is therefore incumbent upon Defendants to show the composite interest rate in effect so that the borrowers can understand exactly what they will be paying for the loan.

102.    A lender violates TILA and Regulation Z by failing to list the composite annual interest rate in variable rate loans that have a discounted initial rate.  The Option ARM loan sold to Plaintiffs and Class members by Defendants is a variable rate loan.  At all relevant times during the liability period, Defendants listed an annual interest rate in the Note that, in truth, would only be provided for the first thirty to forty-five days of a thirty year loan, and would, with one hundred percent certainty, be increased after that first month.  Because Defendants failed to clearly and conspicuously disclose the composite annual percentage rate on these loans, and instead listed a different interest rate in the documents provided to consumers, Defendants violated TILA and Regulation Z, and failed to provide disclosures that did not obscure relevant information.

103.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.18 require lenders to make disclosures concerning the interest rates applicable to home loans in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose.  Further, the regulations require lenders to present the interest rate disclosures "in a way that does not obscure the relationship of the terms to each other."  Defendants failed to meet the disclosure mandates required of them concerning the APR they actually applied to Plaintiffs' and Class members' loans, as well as the interest rate Defendants actually charged to Plaintiffs and Class members.

104.    Defendants' disclosure in the Note concerning the APR is, at best, unclear and inconspicuous.  At worst, it is intentionally deceptive.  In either case, it is certainly different from the APR set forth by Defendants in the TILDS.

105.    The APR set forth in the Note is the teaser rate that actually applied to the loan for only one month.  At no time did Defendants make it clear in the Note or TILDS that this low promised rate (the same rate upon which Defendants based the first three to five years of the written payment schedule they provided to Plaintiffs and Class members) was absolutely certain to apply only for the first thirty days of the loan.  Instead, Defendants used terms like "may" when discussing

1  potential interest rate increases, when in fact it was an absolute certainty that the interest rate listed

2  would only be provided for the first thirty days of the loan, and would be raised when the first

3  payment was due.

4       106.   Moreover, Defendants employed a convoluted, confusing and circuitous

5  methodology in the Note to describe the interest rates applicable to the loan.  In one part of the

6  Note, Defendants state that the promised low interest rate is the rate until the "change date."  A

7  description of the change date is found in another part of the Note.  A description of how the

8  interest rate is calculated on the change date is found in yet another part of the Note.  This disjointed

9  method employed by Defendants to provide this information to consumers makes it extremely

10  difficult, if not impossible, for anyone to determine that the change date corresponds to the very

11  first monthly payment Plaintiffs and Class members make on their loans and that the interest rate

12  will certainly increase on that date.

13       107.   The convoluted language used by Defendants to disclose the interest rate on

14  Plaintiffs' and Class members' loans is not clear and conspicuous.  Rather, the disclosures used by

15  Defendants were unclear and misleading.  Defendants' promise of a low interest rate is and was

16  wholly illusory and the deception, as alleged herein, was uniformly practiced on Plaintiffs and Class

17  members by Defendants to facilitate sales of these ARM loans to consumers.

18       108.   Defendants further concealed the APR applicable to the loan when they identified

19  the amount of Plaintiffs' and Class members' initial monthly payments in the Note.  The "initial

20  monthly payments" amount figure is exactly equal to what the payments would be if the APR listed

21  in the note as promised to Plaintiffs actually applied to the principal balance on the loans.  By

22  identifying "initial monthly payments" based upon the Note APR, rather than the Composite APR,

23  Defendants made their "disclosures" regarding the interest rate applicable to the loan unclear,

24  inconspicuous and confusing.  Thus, the "initial monthly payments" amount provided by

25  Defendants was unclear and deceptive as it caused consumers to believe that they would, in fact,

26  receive the teaser interest rate promised to them.

27       109.   The payment schedule identified in the TILDS has the same effect.  The TILDS lists

28  monthly payment amounts for the first several years of the loan based on the low "teaser" rate.  That

payment schedule suggests that the 1% "teaser" rate is applied to the loan continuously throughout the first several years of the loan term.  In truth, however, this payment schedule has no relation to the APR Defendants actually charged Plaintiffs and Class members on their loans.  As a result, that payment schedule made Defendants' other "disclosures" regarding the interest rate applicable to Plaintiffs' and Class members' loans unclear, inconspicuous and confusing.

110.    Defendants failed to clearly, conspicuously and accurately disclose the actual interest rate applied to Plaintiffs' loan.  Defendants also failed to disclose to, and by omission failed to inform Plaintiffs that the payment amounts listed in the payment schedule did not include any amount for the principal on the loan and were in fact insufficient to pay all of the interest accruing. Based on the payment schedule listed in the Note and TILDS, Plaintiffs and Class members reasonably believed that the payments would be sufficient to meet the loan obligations in the Note. However, the payment schedule provided by Defendants did not pay any principal on the loan and only included a partial payment towards the interest Defendants charged Plaintiffs and Class members for these loans.

111.    At all relevant times during the liability period, Defendants failed to clearly, conspicuously and accurately disclose in the Note and TILDS a payment amount that was sufficient to pay both principal and interest.  Plaintiffs reasonably believed that if they made the payments according to Defendants' payment schedule, the payments would, in fact, be paying off both principal and interest.  However, the payment amounts stated in Defendants' payment schedule did not include any principal on the loans at all and were only a partial payment of the interest Defendants were charging on these loans.

**F.    Defendants' Failure to Clearly and Conspicuously Disclose that the Initial Interest Rate is Discounted Violates TILA**

112.    Variable rate loans are based on a "margin" and an "index."  The index is often the Prime Rate or the LIBOR exchange rate.  The margin is the amount the lender charges over and above that indexed rate.

113.    TILA and Regulation Z require that when the interest rate on a loan is a "discounted rate" (*i.e.*, not based on the index and margin) a separate disclosure is required.  The disclosure must

1    also inform borrowers that, after the discounted rate falls away, the interest rate will increase and it

2    must conspicuously describe all of the circumstances under which the interest rate will increase.

3    Further, the disclosure must inform the borrower what the true cost of the loan is.

4         114.    The Federal Reserve Board has established disclosure requirements for variable rate

5    loans.  26 C.F.R. § 226.19 requires lenders to disclose the frequency of interest rate and payment

6    adjustments to borrowers.  If interest rate changes will be imposed more frequently or at different

7    intervals than payment changes, a creditor must disclose the frequency and timing of both types of

8    changes.

9         115.    Here, the Note at issue only stated that the interest rate *may* increase in the future.

10   However, it was absolutely certain, not merely possible, that the interest rate would increase above

11   the initial, discounted rate.  The interest rate was guaranteed to go up after 30 days, when the

12   discounted interest rate expired.  At all relevant times, Defendants failed to clearly, conspicuously

13   and unambiguously disclose this critical fact as required by law.

14        116.    Further violating TILA's disclosure requirements, Defendants' loan documents state

15   that the interest rate *may* increase during the term of this transaction if the index increases.  That

16   statement is incomplete and misleading, as an increase in the index was not the only thing that could

17   cause an increase in the interest rate.  Because the disclosed interest rate was discounted, it was

18   absolutely certain to increase even without any change in the index.  Thus, Defendants' disclosures

19   were unclear, inconspicuous, ambiguous and misleading in violation of TILA.

20        117.    Defendants failed to disclose to, and by omission, failed to inform Plaintiffs and

21   Class members that the initial interest rate was discounted, and that it was absolutely certain to

22   increase even when the index did not rise.  Due to the initial discounted interest rate being listed at

23   1.00%, the interest rate would increase because the index and margin were several points higher.

24   Even when Defendants did provide a disclosure that stated the initial payment was not based on the

25   index, they did so in a manner that was not clear and conspicuous.  Because the loan documents

26   failed to provide this extremely important material information in a clear and conspicuous manner

27   that did not obscure its importance, Defendants' disclosure failed to satisfy the requirements of

28   TILA.

118.    Defendants failed to disclose to Plaintiffs and Class members that their interest rate was, with 100% certainty, going to increase, regardless of whether the index upon which their loans are based changed.  As such, Defendants violated TILA and Regulation Z by providing Plaintiffs and Class members with unclear, deceptive and poorly drafted or intentionally misleading disclosures.

119.    Defendants also failed to disclose all of the ways by which the interest rate applicable to Plaintiffs' and Class members' loans could increase, in violation of TILA.

**G.    Defendants' Failure to Clearly and Conspicuously Disclose the Effect of the Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

120.    The Option ARM loans at issue contained a variable rate feature with an initial teaser rate with payment caps.  The payment cap is a limit on how much the payment may be increased annually.  Its purpose is to provide borrowers with a limit on how much their payment can increase from year to year.  The loans issued by Defendants had a 7.5% payment cap, which means that a borrower would only see their payment rise each year by a maximum of 7.5%.  (*i.e.*, a $1,000 monthly payment in year one, could go to a $1,075 payment in year two).

121.    FRB Commentary to 12 C.F.R. § 226.17(c)(1)(10)(iii)  states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."  Thus, at all relevant times during the liability period, Defendants had a duty to Plaintiffs and Class members to disclose in the payment schedule of the TILDS the effect the payment cap would have on the loans.

122.    Defendants failed to disclose to, and by omission, failed to inform Plaintiffs and Class members that the payment cap would cause hundreds, if not thousands of dollars, each month, to be secretly added to principle.

123.    As a direct and proximate result, Defendants failed to disclose to, and by omission, failed to inform Plaintiffs and Class members of the effect of the payment cap in violation of 12 C.F.R. § 226.17.

124.    The violations of TILA and Regulation Z described in this Complaint are apparent on the face of the Note, TILDS and other disclosure documents provided to Plaintiffs and Class members because the disclosures provided can be determined to be incomplete or inaccurate by a comparison among the TILDS, the other disclosure statements, and the Note described herein. American Home Mortgage Acceptance, Inc. originally prepared and provided the Note, TILDS and other disclosure documents to Plaintiffs and Class members.  Thereafter the loans were voluntarily sold and/or assigned to American Home Mortgage Investment Trust 2005-2, American Home Mortgage Servicing LLC, Deutsche Bank National Trust Company and Does 1-10.  At no time did American Home Mortgage Investment Trust 2005-2, American Home Mortgage Servicing LLC, Deutsche Bank National Trust Company or Does 1-10 correct or remedy any of the failures of disclosure or misleading disclosures described herein.

125.    As a direct and proximate result of Defendants' violations of TILA, as alleged herein, Plaintiffs and Class members have suffered injury in an amount to be determined at time of trial.  If Defendants had not violated TILA and had instead clearly and conspicuously disclosed the material terms of Defendants' Option ARM loan, as alleged herein, Plaintiffs and Class members would not have entered into the home loan contracts which are the subject of this action.  Because Defendants failed to make the proper disclosures required under TILA, Plaintiffs and Class members now seek redress in an amount and/or type as proven at time of trial.

126.    WHEREFORE, Plaintiffs and Class members are entitled to an order declaring that Defendants American Home Mortgage Investment Trust 2005-2, American Home Mortgage Servicing LLC, Deutsche Bank National Trust Company and Does 1-10 violated TILA, 15 U.S.C. §1601, *et seq*., that Plaintiffs and the Class have the right to rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, attorneys fees, litigation costs and expenses and costs of suit, and for an order rescinding Plaintiffs' individual mortgage and those of any Class member desirous of such relief, and for an order awarding other relief as the Court deems just and proper.

## VII.    SECOND CAUSE OF ACTION

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
BUS. & PROF. CODE § 17200, *et seq.*, - "UNLAWFUL" BUSINESS ACTS
OR PRACTICES PREDICATED ON VIOLATIONS OF TILA**

**(Against Defendants American Home Mortgage Investment Trust 2005-2,
American Home Mortgage Securities LLC, Deutsche Bank National
Trust Company and Does 1-10)**

127.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

128.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class and in their capacity as private attorneys general against Defendants for their unlawful business acts and/or practices pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful business acts and/or practices.

129.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by Cal. Bus. & Prof. Code § 17200, *et seq.*

130.    The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

131.    By engaging in the above described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

132.    Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations and said predicate acts are therefore *per se* violations of § 17200, *et seq.*  These predicate unlawful business acts and/or practices include Defendants' failure to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601, *et seq.*, Regulation Z and FRB Commentary.  And, as described in more detail above, Defendants also failed in a number of ways to clearly or accurately disclose the terms of the Option ARM loan to Plaintiffs as required under TILA.

133.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive advantage over their competitors.

134.    As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiffs and others similarly situated who purchased the Option ARM loans as described herein.

135.    In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

136.    The unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants as described herein. Plaintiffs and other members of the general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

137.    As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiffs and Class members have lost thousands if not millions of dollars of equity in their homes. Plaintiffs and Class members are direct victims of Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

138.    WHEREFORE, Plaintiffs and Class members are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and deceptive acts and practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unlawful activity.

## VIII.    THIRD CAUSE OF ACTION

## FRAUDULENT OMISSIONS

**(Against Defendants American Home Mortgage Investment Trust 2005-2,
American Home Mortgage Securities LLC, Deutsche Bank National
Trust Company and Does 1-10)**

139.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

140.    As alleged herein, pursuant to TILA, 15 U.S.C. § 1601, *et seq.*, Regulation Z (12 C.F.R. § 226) and FRB Commentary, Defendants had a duty to disclose to Plaintiffs and each Class member: (i) the actual interest rate being charged on the Note; (ii) that negative amortization would occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the note was discounted.

141.    Defendants further had a duty to disclose to Plaintiffs, and each Class member: (i) the actual interest rate being charged on the Note; (ii) that negative amortization would occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the Note was discounted, based upon Defendants' partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.

142.    Defendants did not disclose these facts that they had a duty to disclose.  Instead, they concealed them.

143.    The Note states at ¶ 3(A) "I will pay Principal and interest by making payments every month" and "I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note."  In ¶ 7(A), under the heading "BORROWER'S FAILURE TO PAY AS REQUIRED," the Note states, "[t]he amount of the charge will be 5.000% of my *overdue payment of Principal and Interest*." (emphasis added). However, the truth was that Plaintiffs' payments would not be and were not applied to both principal and interest because the payment rate Defendants provided was insufficient to pay both principal and interest.  In fact, the payment rate was not even sufficient to pay all of the interest, thereby causing negative amortization to occur.

144.    The Note further states at ¶ 4(G), "my monthly payment *could be less* than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal . . ." and "[f]or each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the interest portion and will add the difference to my unpaid principal . . ." (emphasis added).  However, the payment schedules provided by Defendants in the TILDS were absolutely incapable of covering the amount of interest due and therefore these statements were false in that they omitted this material fact.

145.    The Notes list an interest rate and a payment amount based on that initial interest rate.  However, the TILDS given to Plaintiffs and Class members and never corrected by any of the Defendants includes a schedule of payments which includes that initial payment rate, but discloses a different interest rate.  In truth, the payment schedule stated in the TILDS is wholly unrelated to the true interest rate being charged on the loans, and at all relevant times during the liability period,

Defendants failed to disclose to, and by omission failed to inform, Plaintiffs and Class members of this important material information.

146.    The aforementioned omitted information was not known to Plaintiffs and Class members.  At all relevant times, Defendants failed to disclose and/or actively concealed it by making such statements and partial, misleading representations alleged herein to Plaintiffs and Class members.  Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note, and the payment rate disclosed by Defendants was insufficient to pay both principal and interest, negative amortization occurred.

147.    Defendants, and each of them, failed to disclose to, and by omission failed to inform Plaintiffs and Class members that: (i) the payment rate provided to Plaintiffs and Class members on the TILDS was insufficient to pay both principal and interest; (ii) negative amortization was absolutely certain to occur if Plaintiffs and Class members made payments according to the payment schedule provided by Defendants; and (iii) loss of equity and/or loss of Plaintiffs' and Class members' residences was substantially certain to occur if Plaintiffs and Class members made payments according to the payment schedule provided by Defendants.

148.    As alleged herein, Defendants had a duty to disclose to Plaintiffs and Class members, and at all relevant times, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendants had exclusive knowledge of material facts, including but not limited to, (i) that the disclosed interest was not the actual interest rate charged on the Note; (ii) that negative amortization was certain to occur, and (iii) that the initial rate was discounted.  The concealed and omitted information was not known to Plaintiffs and Class members.  Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note, and the payment rate disclosed by Defendants was insufficient to pay both principal and interest, negative amortization occurred.

149.    From the inception of the Option ARM loan scheme until the present, Defendants have engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not reasonably discoverable by Plaintiffs and Class members, regarding the true facts concerning the actual interest rate charged on the loans, that negative amortization that was certain

to occur, and that the initial interest rate was discounted, all of which Defendants were duty bound to clearly and conspicuously disclose to Plaintiffs and Class members in the TILDS.

150.    Defendants have known from the inception of their Option ARM loan scheme that these loans: (i) do not provide the promised initial interest rate for the first three to five years of the Note, (ii) that negative amortization would occur and that Plaintiffs' and Class members' principal balances would increase, and (iii) that the initial interest rate was discounted and did not accurately reflect the interest that consumers were being charged on the loans.

151.    Defendants purposefully and intentionally devised this Option ARM loan scheme to defraud and/or mislead consumers into believing that these loans would provide a low-interest rate loan for the first three to five years of the Note and that if they made their payments according to the payment schedule provided by Defendants that it would be sufficient to pay both principal and interest.

152.    The omitted information, as alleged herein, was material to Plaintiffs and Class members.  Had the information been disclosed, Plaintiffs and Class members would not have entered into the loans.

153.    As a direct and proximate result of Defendants' failures to disclose and omission of material facts, as alleged herein, Plaintiffs and Class members have suffered damages, which include, but are not limited to, the loss of equity Plaintiffs and Class members had in their homes prior to entering these loans.

154.    The wrongful conduct of Defendants, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being of Plaintiff and Class members.  Accordingly, Plaintiffs and Class members seek punitive damages against Defendants in an amount to deter Defendants from similar conduct in the future.

155.    WHEREFORE, Plaintiffs and Class members are entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, exemplary damages, prejudgment interest and costs.

### IX.    FOURTH CAUSE OF ACTION

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
BUS. & PROF. CODE § 17200, *et seq.* - "UNFAIR" AND "FRAUDULENT"
BUSINESS ACTS OR PRACTICES**

**(Against Defendants American Home Mortgage Investment Trust 2005-2;
American Home Mortgage Securities LLC; Deutsche Bank National
Trust Company; and Does 1-10)**

156.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

157.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class, and in their capacity as private attorneys general against Defendants for their unfair, fraudulent and/or deceptive business acts and/or practices pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits all unfair and/or fraudulent business act and/or practices.

158.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by Cal. Bus. & Prof. Code § 17200, *et seq.*

159.    The instant claim is predicated on the generally applicable duty of any contracting party to not misrepresent material facts and on the duty to refrain from unfair and deceptive business practices.  Plaintiffs and Class members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

160.    At all relevant times, Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their Option ARM loan.  Defendants, and each of them, sold Plaintiffs and Class members a deceptively devised financial product.  Defendants sold their Option ARM loan product to consumers, including Plaintiffs, in a false or deceptive manner.  Defendants represented to the general public through brochures, flyers and other substantially identical materials, a loan which appeared to have a very low, fixed interest rate for a period of three to five years and no negative amortization.  Further,

Defendants disguised from Plaintiffs and Class members the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.

161.    Defendants lured Plaintiffs and Class members into the Option ARM loan with promises of low fixed interest rates. Once Plaintiffs and Class members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they advertised and promised to Plaintiffs and Class members. After entering these loans, Plaintiffs and Class members could not escape because Defendants purposefully included in these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans.

162.    Plaintiffs and Class members were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants uniformly represented to Plaintiffs and Class members that in accepting these loan terms, Plaintiffs and Class members would be able to lower their mortgage payment and save money.

163.    Defendants represented their Option ARM loan as having a low fixed interest rate, *i.e.*, typically between 1% and 3%. However, Defendants did not disclose that this was just a "teaser" rate, the purpose of which was to get consumers to enter into loan agreements with Defendants. Defendants did not disclose to Plaintiffs and Class members that the "teaser" rate was not the fixed rate that Defendants would actually charge Plaintiffs and Class members on their outstanding loan balances.

164.    Based on Defendants' representations and conduct, Plaintiffs and Class members agreed to finance their primary residences through Defendants' Option ARM loans. Plaintiffs and Class members were told they were being sold a home loan with a low interest rate, fixed for the first three to five years of the loan. Plaintiffs and Class members were also led to believe that if they made payments based on this advertised interest rate, and the payment schedule provided to them by Defendants, the loan was a no negative amortization home loan. After the fixed interest period, Plaintiffs and Class members were told their rate "may" change. Plaintiffs and Class members believed they would then be able to re-finance to another home loan. Plaintiffs and Class members believed these facts to be true because that is what Defendants led consumers to believe.

165.    Defendants aggressively sold their Option ARM product as a fixed low interest rate home loan.  Defendants knew that if positioned in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them.  Defendants also knew, however, that they were selling their product in a false and deceptive manner.  While Defendants trumpeted their low, fixed rate loans to the public, Defendants knew, however, that this was not entirely true.

166.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate.  Unbeknownst to Plaintiffs and Class members, the actual interest rate they were charged on their loans was not fixed.  After purchasing Defendants' Option ARM loan product, Plaintiffs and Class members never actually received the benefit of the low advertised interest rate, or, in some cases, consumers received the low rate for just a single month.  Immediately thereafter, Defendants in every instance and for every loan increased the interest rate they charged Plaintiffs and Class members.  Once Plaintiffs and Class members accepted Defendants' Option ARM loan, they had no viable option to extricate themselves because these loan agreements included a draconian pre-payment penalty.

167.    Defendants perpetrated a bait and switch scheme on Plaintiffs and Class members.  Defendants' conduct and failure to disclose the whole truth about the loan's interest rate and describing the loan as having a fixed interest rate was deceptive and unfair.  Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

168.    The acts, misrepresentations, omissions, and practices of Defendants alleged above constitute unfair, and/or fraudulent business acts and/or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

169.    By engaging in the above described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

170.    Defendants' conduct, as fully described above, was likely to deceive members of the consuming public, and at all times, Defendants' failures to disclose and omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

171.   Defendants' misconduct as alleged herein gave Defendants an unfair competitive advantage over their competitors.

172.   As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiffs and others similarly situated who purchased the Option ARM loans as described herein.

173.   In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

174.   The harm to Plaintiffs, members of the general public and others similarly situated outweighs the utility of Defendants' policies, acts and/or practices, and consequently, Defendants' conduct herein constitutes an unlawful business act or practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

175.   The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants' Option ARM loans as described herein.  Plaintiffs and other members of the general public have no other remedy at law that will prevent Defendants' misconduct as alleged herein from reoccurring in the future.

176.   As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiffs and Class members have lost thousands if not millions of dollars of equity in their homes.  Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct, and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

177.   WHEREFORE, Plaintiffs and Class members are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent, and deceptive acts and/or practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

## X.    FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against All Defendants)

178.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

179.    Plaintiffs and Class members entered into written home loan agreements with American Home Mortgage Acceptance, Inc., which agreements were subsequently sold or assigned to American Home Mortgage Investment Trust 2005-2; American Home Mortgage Securities LLC; Deutsche Bank National Trust Company and Does 1-10.  Defendant Wells Fargo Bank, N.A. is the "Master Servicer" on the loans at issue here and, in that capacity, is responsible for enforcing provisions of the Note relevant to this claim and applying Plaintiffs' and Class members' payments in the manner required by the Notes.

180.    The Notes were drafted by Defendants and could not be modified by Plaintiffs or Class members due to Defendants' superior bargaining position.  The Notes were offered to Plaintiffs and the Class on a take it or leave it basis.  As such, the Notes at issue are contracts of adhesion.  The Notes describe the terms and respective obligations applicable to the parties herein.

181.    The Notes describe Plaintiffs' and Class members' interest rate on the loan as a low interest rate, typically between 1% and 3%.  In addition, as required by federal law, Defendants provided a TILDS concerning the home loan agreement that shows a payment scheduled based on the that low 1% to 3% interest rate.  For the first three to five years the payment schedule shows that Plaintiffs' and Class members' monthly payment obligations to Defendants are the exact payments necessary to pay off all principal and interest during the terms of the loans if, indeed, the interest rate actually charged by Defendants on the loans was the low interest rate promised.

182.    Defendants expressly and/or through their conduct and actions impliedly agreed that Plaintiffs' and Class members' monthly payment obligations would be sufficient to pay and would be applied to pay both the principal and interest owed on the loans.  Defendants breached this agreement and never applied any of Plaintiffs' and Class members' payments to principal.

183.    The written payment schedules provided to Plaintiffs reinforced the promise that Plaintiffs' and Class members' payments would be applied to both principal and interest.  Those

schedules show that the payment amounts owed by Plaintiffs and Class members in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest actually charged on the loan was the low interest rate promised. Had the Defendants done as promised, the payments would have been sufficient to pay both principal and interest.

184. Instead, Defendants immediately raised Plaintiffs' and Class members' interest rates and applied *no part* of Plaintiffs' or Class members' payments to the principal balances on their loans. In fact, because Defendants charged more interest than was agreed to, the payments, as disclosed by Defendants, were insufficient to cover the interest charge and thus principal balances increased (which is the negative amortization built into the loan).

185. Defendants breached the written contractual agreement by failing to apply any portion of Plaintiffs' and Class members' monthly payments towards their principal loan balances.

186. Plaintiffs and Class members, on the other hand, did all of the things the contract required of them. Plaintiffs and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

187. As a result of Defendants' breach of the agreement, Plaintiffs and Class members have suffered harm. Plaintiffs and Class members have incurred additional charges to their principal loan balance. Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiffs and Class members in danger of losing their homes through foreclosure as Defendants have caused Plaintiffs' and Class members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

188. At all relevant times, there existed a gross inequality of bargaining power between the parties to the Option ARM loan contracts. At all relevant times, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon Plaintiffs and Class members extremely harsh, one-sided provisions in the contract, which Plaintiffs and Class members were not made aware of and did not comprehend (*e.g.*, Defendants' fraud and failures to clearly and conspicuously disclose as alleged herein), and which attempted to severely limit Defendants'

obligations under the contracts at the expense of Plaintiffs and Class members, as alleged herein. As a result of these extremely harsh, one-sided provisions, including but not limited to the provisions which limit the "teaser" interest rate for one month or less, these provisions are unconscionable and therefore unenforceable.

189.    WHEREFORE, Plaintiffs and Class members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## XI.    SIXTH CAUSE OF ACTION

### TORTIOUS BREACH OF IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING

**(Against Defendants American Home Mortgage Investment Trust 2005-2; American Home Mortgage Securities LLC; Deutsche Bank National Trust Company; and Does 1-10.)**

190.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

191.    Defendants entered into or were the assignees of written agreements with Plaintiffs and Class members based on representations Defendants made directly and indirectly to Plaintiffs and Class members about the terms of their loans.

192.    Defendants expressly represented to Plaintiffs and Class members that they would provide loans secured by Plaintiffs' and Class members' homes, and that the loans would have a promised fixed low interest rate for a period of three to five years.

193.    Defendants also represented that if Plaintiffs and Class members made the monthly payments in the amount prescribed by Defendants, no negative amortization would occur.  The Note expressly states and/or implies that Plaintiffs' and Class members' monthly payment obligation *will* be applied to pay both principal and interest owed on the loan.

194.    The written payment schedules prepared by Defendants that were applicable to Plaintiffs' and Class members' loans, show that the payment amounts owed by Plaintiffs and Class members to Defendants in year one are exactly equal to the amount required to pay off the loan pursuant to an amortization schedule based upon the low interest rate promised.  If Defendants acted as they promised, the payments would have been sufficient to pay both principal and interest.

195.     Instead, Defendants immediately raised Plaintiffs' and Class members' interest rate and applied **no part** of Plaintiffs' and Class members' payments to principal.  Moreover, because Defendants charged more interest than was disclosed and agreed to in the loans, Plaintiffs' and Class members' payments were insufficient to cover the interest that Defendants charged resulting in an increase in the amount of principal Plaintiffs and Class members owed on their homes.

196.     Defendants unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the contract.  These loans will cost Plaintiffs and Class members thousands of dollars more than represented by Defendants.  Plaintiffs and Class members did not receive the fixed low interest rate home loan promised them by Defendants.  Defendants have caused Plaintiffs and Class members to lose equity in their homes and therefore have denied Plaintiffs and Class members the enjoyment and security of one of their most important investments.

197.     Plaintiffs and Class members, on the other hand, performed all of the actions that the contract required of them.  Plaintiffs and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

198.     At all relevant times, Defendants unreasonably denied Plaintiffs and Class members the benefits promised to them under the terms of the Note, including but not limited to a low interest rate for the first three to five years of the loan, clear and conspicuous disclosure of a payment amount sufficient to pay both principal and interest so as to avoid negative amortization, and the other failures to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601, *et seq*., Regulation Z and FRB Commentary, as alleged herein.

199.     Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or omissions to mislead and/or deceive Plaintiffs and others similarly situated as alleged herein.

200.     Defendants' breaches, as alleged herein were committed with willful and wanton disregard for whether or not Plaintiffs or Class members would actually receive a home loan that would provide the promised low interest and payment rate for the first three to five years of the loan sufficient to pay both principal and interest.

201.    Upon information and belief and at all relevant times, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and otherwise sold these Option ARM loans throughout the United States, including in the State of California.

202.    Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and Class members.

203.    At all relevant times, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

204.    As a result of Defendants' conduct, Plaintiffs and Class members have suffered harm.  Plaintiffs and Class members have incurred additional charges to their principal loan balance.  Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal loan balance.  Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and Class members in danger of losing their homes through foreclosure and, as a direct and proximate result of said misconduct, caused Plaintiffs' and Class members' principal loan balances to increase, which has limited these consumers' ability to make their future mortgage payments or obtain alternative home loan financing.

205.    WHEREFORE, Plaintiffs and Class members are entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against each Defendant jointly and severally, as follows:

1    A.    An order certifying this case as a class action and appointing Plaintiffs and their

2  counsel to represent the Class;

3    B.    For actual damages according to proof;

4    C.    For compensatory damages as permitted by law;

5    D.    For consequential damages as permitted by law;

6    E.    For statutory damages as permitted by law (against all Defendants other than Wells

7  Fargo Bank, N.A.);

8    F.    For punitive damages as permitted by law (against all Defendants other than Wells

9  Fargo Bank, N.A.);

10    G.    For rescission (against all Defendants other than Wells Fargo Bank, N.A.);

11    H.    For equitable relief, including restitution (against all Defendants other than Wells

12  Fargo Bank, N.A.);

13    I.    For restitutionary disgorgement of all profits (against Defendants other than Wells

14  Fargo Bank, N.A.) obtained as a result of their unfair competition;

15    J.    For interest as permitted by law;

16    K.    For Declaratory Relief;

17    L.    For a mandatory injunction requiring Defendants to permanently include in every

18  Option ARM loan and disclosure statement: (i) clear and conspicuous disclosure of the APR on the

19  Note(s) and disclosure statement(s) as required under 12 C.F.R. § 226.17 by; (ii) clear and

20  conspicuous disclosure in the Note(s) and the disclosure statement(s) that payments on the variable

21  interest rate loan during the initial period at the teaser rate will result in negative amortization and

22  that the principal balance will increase as required under 12 C.F.R. § 226.19; and (iii) clear and

23  conspicuous disclosure that the initial interest rate provided is discounted and does not reflect the

24  actual interest that Plaintiffs would be paying on the Note(s).

25    M.    For reasonable attorneys' fees and costs; and

26    N.    For such other relief as is just and proper.

27

28

DREIER LLP
499 PARK AVENUE
NEW YORK, NY 10022

CLASS ACTION COMPLAINT

1  DATED: August 8, 2008      **ARBOGAST & BERNS LLP**

2                 By: /s/ David M. Arbogast

3                 David M. Arbogast (SBN 167571)
                  darbogast@law111.com

4                 Jeffrey K. Berns (SBN 131351)
                  jberns@law111.com

5                 19510 Ventura Boulevard, Suite 200
                  Tarzana, CA 91356

6                 Phone: (818) 961-2000
                  Fax: (818) 861-1775

7                 **DREIER LLP**

8                 Lee A. Weiss
                  lweiss@dreierllp.com

9                 Rebecca Tingey
                  rtingey@dreierllp.com

10                499 Park Avenue
                  New York, NY 10022

11                Phone: (212) 328-6100
                  Fax: (212) 328-6101

12                **KIESEL BOUCHER LARSON LLP**
                  Paul R. Kiesel (SBN 119854)

13                kiesel@kbla.com
                  Patrick DeBlase (SBN 167138)

14                deblase@kbla.com
                  Michael C. Eyerly (SBN 178693)

15                eyerly@kbla.com
                  8648 Wilshire Blvd.

16                Beverly Hills, CA 90211
                  Phone: (310) 854-4444

17                Fax: (310) 854-0812

18                *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

7061793

# ADJUSTABLE RATE NOTE
## 12-MTA INDEX - PAYMENT AND RATE CAPS

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ____125.000%__ OF THE ORIGINAL AMOUNT (OR $ 364,375.00____ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| June 23, 2005 | Visalia | California |
|---|---|---|
| | (City) | (State) |

___5522 West Perez Avenue, Visalia, CA  93291___
(Property Address)

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ____291,500.00____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is ___American Home Mortgage Acceptance, Inc.___ _____ . I will make all payments under this Note in form of cash, check or money order.  I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2.  INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid.  First I will pay interest at a yearly rate of ___1.000__ %.  The interest rate I will pay may change.  The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month.  In this Note, "Payments" refer to Principal and interest payment only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I Will make my monthly payments on ___1st_____ day of each month beginning on __August, 2005_____, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied to interest before Principal.  If, on __July 1, 2035_____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at PO Box 660029, Dallas, TX  75266-0029 _____, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $_937.57_____ , unless adjusted at an earlier time under Section 4(H) of this Note.

DOC #:943333                    APPL #:0000898255
                                Page 1 of 6                    Rev. 6/07/05

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and Interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st_____ day of August , 2005 , _____ , and on that day every month thereafter. Each such day is called a "Change Date"

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as the 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____ __Three and 440 Thousandths_____ percentage points ___3.440__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Nine and 950 Thousandths_____ _____ percentage points ___9.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing _____August 1, 2006_____ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 day prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my Payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a

Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to _____125.000% of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that _125.000%_ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __Five_____ anniversary of the due date of the first monthly payment, and on that same day every __Five____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:**  I understand that the Note Holder will also charge a return item charge in an amount permitted and otherwise in accordance with Applicable Law in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn.  Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _____15_____ calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be __5.000__ % of my overdue payment of Principal and Interest.  I will pay this late charge promptly but only once for each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given to Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law.  Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

### Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if:  (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)          _____(Seal)
Elvin Valenzuela            -Borrower          Phyllis Valenzuela          -Borrower


_____(Seal)          _____(Seal)
                            -Borrower                                      -Borrower


_____(Seal)          _____(Seal)
                            -Borrower                                      -Borrower


_____(Seal)          _____(Seal)
                            -Borrower                                      -Borrower

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:  American Home Mortgage Acceptance, Inc.
1500 W. Shaw Avenue, Suite 403
Fresno, CA  93711

☐ Preliminary  ☒ Final
*DATE:*  06/23/05
*LOAN NO.:*
*Type of Loan:*  Conventional
APP NO.:0000898255

BORROWERS:  Elvin Valenzuela
Phyllis Valenzuela

ADDRESS:  5522 West Perez Avenue
CITY/STATE/ZIP:Visalia, CA  93291
PROPERTY:  5522 West Perez Avenue
Visalia, CA 93291

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.067 % | $ 385,457.34 | $ 286,015.22 | $ 671,472.56 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 12 | $937.57 | August 1, 2005 | 12 | $1,007.89 | August 1, 2006 |
| 12 | $1,083.48 | August 1, 2007 | 12 | $1,164.74 | August 1, 2008 |
| 12 | $1,252.10 | August 1, 2009 | 299 | $2,020.41 | August 1, 2010 |
| 1 | $2,020.61 | July 1, 2035 | | | |

DEMAND FEATURE:  ☒☒ This loan does not have a Demand Feature.  ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☒☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been  provided to you earlier.
THE CURRENT INDEX RATE IS 2.504%

SECURITY:  You are giving a security interest in the property located at:  5522 West Perez Avenue
Visalia, CA 93291

ASSUMPTION:  Someone buying this property  ☐ cannot assume the remaining balance due under original mortgage terms
☒☒ may assume, subject to lender's conditions, the remaining balance due under  original mortgage terms.

FILING / RECORDING FEES:  $

PROPERTY INSURANCE:  ☒☒ Property hazard insurance in the amount of $  291,500.00  with a mortgage clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from  any insurance company acceptable to the lender.
Hazard insurance  ☐ is  ☒☒ is not available through the lender at an estimated cost of  N/A  for a  year term.

LATE CHARGES:  If your payment is more than  15  days late, you will be charged a late charge of  5.000  % of the
overdue payment.

PREPAYMENT:  If you pay off your loan early, you
☒☒ may  ☐ will not  have to pay a penalty.
☐ may  ☒☒ will not  be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding  non-payment, default, required repayment in full before scheduled date,  and prepayment refunds and penalties.
± means estimate

I/We hereby acknowledge reading and receiving a complete copy of this  disclosure.

_____    _____
Elvin Valenzuela          BORROWER / DATE    Phyllis Valenzuela          BORROWER / DATE

BORROWER / DATE          BORROWER / DATE

DOC #:060401 / rev. 06/2005    APPL #:0000898255  LOAN #:0000000000
-788 (9901)    9N31 9801.05          VMP MORTGAGE FORMS - (800)521-7291    Page 1 of 2    5/96
© 1999 CBF Systems, Inc.    The contents of this form in whole or in part are protected under the copyright    laws of the United States.

ADDENDUM B

**ALTA POLICY** must contain Endorsements 8.1,100,116,111.5 with liability in the amount of our loan.

**LIABILITY SUBJECT ONLY TO:**  2004/05 All PAID
Funds may be used for account of the vestees, and you will record all instruments when you comply with the following:
    1.  Issue said form of Policy showing title vested as required herein.
    2.  Issue said form of Policy free from encumbrances except items 1,2 pc 3-5ok 6-7 out of preliminary Title Report dated April 22, 2005.
    Secondary financing in the amount of $0.00        has been approved.
**FHA OR VHA:  BUYER CANNOT BE CHARGED FOR ANY ENDORSEMENTS TO ALTA POLICIES.**

**TITLE INSURANCE.**  A standard ALTA title insurance policy with all necessary endorsements (i.e. adjustable rate, environmental lien, easement, encroachment, address, etc.), and without deletions must be obtained at closing.  Any deviation from the standard ALTA policy is unacceptable.  No exceptions from coverage, unusual conditions for coverage, etc. are allowed without the express WRITTEN consent of American Brokers Conduit.  The title policy must insure that American Brokers Conduit has a valid first lien on the subject property.  A title insurance binder dated no more than 30 days prior to closing must be obtained at the closing deleting all exceptions and mortgages.  All taxes, bonds, and assessments coming due on or before the due date of the first monthly payment must be paid at closing and are not included in the escrow account being established by American Brokers Conduit.  Title insurance must be for no more or less than the amount of the mortgage.  **The insured on the title policy must read:  American Brokers Conduit, its successors and assigns as their interest may appear.**

American Brokers Conduit will require a closing protection letter from the title company prior to closing the loan.

**ESCROW IMPOUNDS FOR TAXES AND/OR INSURANCE.**

All taxes, bonds and assessments coming due on August 1, 2005        must be paid at closing and are not included in the escrow account being established by the Lender.

**CLOSING STIPULATION(S)**

The following documents or conditions must be satisfied and/or presented at time of closing.  In the event you are unsure of the acceptability of any document(s) you must contact the Lender.  In no event may you accept any alternative document(s) or unilaterally waive any requirement unless written authorization is provided to you by the lender.

**All of the documents provided herewith are required to be signed, regardless of whether they appear to be duplicates previously provided to the borrower(s).**

**Stipulations to be satisfied:**
If a Power of Attorney is to be used in connection with this loan closing, you must follow the document execution instructions set forth on ADDENDUM "E".

**The following items are required Prior to Funding:**

1. Broker to provide final 1003. typed - signed by the borrower/broker

2. HUD-1 to evidence payoff of citimtg
wells fargo   with an outstanding balance of $256138
28496
.

3. The Notice of Right to Cancel must be signed at closing.

4. Provide Hazard Policy for a minimum of loan amount or replacement cost coverage, with a minimum of 3 months remaining on policy.

5. Provide copy of appraisers current license.

6. The lock for this loan will expire on 08/22/05.  If the loan will not close

**(Attachment Continued Next Page)**