IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ELVIN AND PHYLLIS VALENZUELA, | ) | No. CV-F-08-1179 OWW/SMS |
| | ) | |
| | ) | MEMORANDUM DECISION GRANTING |
| | ) | DEFENDANTS' MOTION TO |
| Plaintiffs, | ) | DISMISS FIFTH AND SIXTH |
| | ) | CAUSES OF ACTION WITHOUT |
| vs. | ) | LEAVE TO AMEND (Docs. 21-22, |
| | ) | 29 & 30) |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| INVESTMENT TRUST 2005-2, | ) | |
| et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

On August 12, 2008, Plaintiffs Elvin and Phyllis Valenzuela
(hereinafter "Plaintiffs") filed a Class Action Complaint against
Defendants American Home Mortgage Investment Trust 2005-2;
American Home Mortgage Securities LLC; Wells Fargo Bank, N.A.;
Deutsche Bank National Trust Company and Does 1-10.  The
Complaint alleges causes of action for: (1) violations of the
Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; (2) violation of
California Business and Professions Code § 17200 *et seq.* -

1

Unlawful Business Practice (TILA); (3) fraudulent omissions; (4) violation of California Business and Professions Code § 17200 *et seq.* - Unfair and Fraudulent Business Practices; (5) breach of contract; and (6) tortious breach of the covenant of good faith and fair dealing.

Plaintiffs allege that they refinanced their home in Visalia, California on June 23, 2005 and entered into an Option ARM loan agreement with American Home Mortgage Acceptance, Inc. Because American Home Mortgage Acceptance, Inc. filed a Chapter 11 bankruptcy petition on August 7, 2007, Plaintiffs have not named it as a defendant in this action. The Complaint alleges American Home Mortgage Investment Trust 2005-2 (hereinafter "Investment Trust 2005-2" or the "Trust") is a Delaware statutory trust that presently owns Option ARM loans that are the subject of the Complaint, including Option ARM loans originated, recorded and held in Tulare County. Defendant American Home Mortgage Securities LLC (hereinafter "Mortgage Securities LLC" was and is engaged in the business of purchasing, packaging and securitizing the Option ARM loans and owned the Option ARM loans that are the subject of this Complaint after it purchased them from American Home Mortgage Acceptance, Inc. Defendant Wells Fargo Bank (hereinafter "Wells Fargo") was and is engaged in the business of servicing the Option ARM loans that are the subject of the Complaint. Defendant Deutsche Bank National Trust Company (hereinafter "Deutsche Bank" or the "Trustee") is the Trustee of the Trust, American Home Mortgage Investment Trust 2005-2. The

2

Option ARM loans which are the subject of the Complaint and all rights and interest under those loans were assigned to the Trustee by American Home Mortgage Securities LLC.

As the facts common to all causes of action, the Complaint alleges:

18. The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiffs and Class members, in writing, as required by law.

19. This action also concerns Defendants' unlawful, fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept Option ARM loans in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

20. Plaintiffs, along with thousands of other similarly situated consumers, were sold an Option ARM home loan by Defendants. The Option ARM loan sold to Plaintiffs and Class members is a deceptively devised financial product. The loan has a variable rate feature with payment caps. The product was sold based on the promise of a low fixed payment resulting from a prominently featured low interest rate. In fact, Plaintiffs and Class members were charged a different, much greater interest rate than promised. Further, Defendants disguised from Plaintiffs and Class members that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur. Further still, once lured into these loans, consumers could not easily extricate themselves from the loans because Defendants included in the loans a stiff and onerous prepayment penalty making it extremely difficult, if not impossible, for borrowers to pay off the loans.

3

**21.** The methods used by Defendants to sell the Option ARM loans to Plaintiffs and Class members violate TILA. TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to borrowers concerning the terms and conditions of their home loans. Defendants failed to make these disclosures in connection with the Option ARM loans sold to Plaintiffs and the Class.

**22.** At all relevant times, Defendants sold their Option ARM loan to consumers, including Plaintiffs, in a false or deceptive manner. Defendants represented to the general public that their Option ARM loan would provide a very low, fixed interest rate for a period of three to five years and no negative amortization. Defendants used this "teaser" rate to lure Plaintiffs into purchasing Defendants' Option ARM loan. However, the low fixed rate was illusory -- a false promise. Plaintiffs and others similarly situated did not receive the benefit of the low rate promised to them. Once signed on to Defendants' loan, the interest rate applied to Plaintiffs' and Class members' loans was immediately and significantly increased.

**23.** Plaintiffs and others similarly situated were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants represented to Plaintiffs and Class members that in accepting these loan terms, they would be able to lower their mortgage payments and save money. Defendants initiated this scheme in order to maximize the amount of loans it sold to consumers and to maximize their profits.

**24.** Based on Defendants' representations, and the misconduct alleged herein, Plaintiffs and Class members agreed to finance their primary residences through Defendants' Option ARM loan. Plaintiffs and Class members were told they were being sold a home loan with a low interest rate of between 1% and 3% (the "teaser" rate), and that the interest rate was fixed for the first three to five years of the loan. Defendants also informed Plaintiffs, and Plaintiffs were led to

4

believe, that if they made payments based on the promised low interest rate, which were the payments reflected in the written payment schedule provided to them by Defendants, that the loan was a no negative amortization home loan. Plaintiffs' payments were to be applied to their principal loan balance as well as interest.

25. After the purported three to five year fixed interest period, Plaintiffs and Class members reasonably believed, based on the representations contained in the documents Defendants provided to Plaintiffs and Class members, that they would be able to refinance their loans and obtain a new loan before their scheduled payments increased. However, the payment schedule provided by Defendants failed to disclose to, and by omission failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiffs and Class members would be unable to refinance their loans as there would be little or no equity left to refinance, and indeed, the principal balance owed on the loan would be more than Plaintiffs had originally borrowed.

26. Plaintiffs believed these facts to be true because that is what the Defendants wanted consumers to believe. Defendants aggressively positioned their product as a fixed, low interest home loan. Defendants knew that if it was positioned in such a manner, their Option ARM loan would be a hugely popular and profitable product for them. Defendants also knew, however, that they were selling the product in a false and deceptive manner. While Defendants trumpeted the low rate loans to the public, Defendants knew their promise of a low interest rate was illusory.

27. In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate. Unbeknownst to Plaintiffs and Class members, the actual interest rate they were charged on their loans was not fixed, was not the low teaser interest rate stated in the loan documentation, and was in fact considerably

5

higher than going market rates. And after purchasing Defendants' Option ARM loan product, Plaintiffs and Class members did not actually receive the benefit of the low teaser rate at all in some cases, or at best, they received that rate for only a single month. Immediately thereafter, Defendants in every instance and for every loan, increased the interest rate they charged to consumers. The now-increased interest charges incurred by Plaintiffs and Class members over and above the fixed interest payment rate were added to the principal balance on their home loans in ever increasing increments, substantially reducing the equity in these borrowers' homes.

28. In stark contrast to this reality, Defendants, through the standardized loan documents they created and supplied to Plaintiffs and Class members, stated that negative amortization was only a mere possibility. Defendants concealed and failed to disclose to Plaintiffs and the Class the fact that the loan, as presented and designed, in fact, *guaranteed* negative amortization. Defendants failed to disclose and omitted the objectively material fact that negative amortization was absolutely certain to occur if consumers followed the payment schedule listed by Defendants in the TILDS. This information was objectively material and necessary for consumers to make an informed decision because this would have revealed that the loan's principal balance would increase if the payment schedule was followed, thereby rendering it impossible to refinance the loan at or around the time the prepayment penalty expired and/or by the time the interest and payment rates re-set. In this respect, Defendants utterly failed to place any warning on the TILDS about negative amortization.

29. At all relevant times, once Plaintiffs and Class members accepted Defendants' Option ARM loan contract, they had no viable option by which to extricate themselves because these Option ARM loan agreements included a draconian pre-payment penalty for a period of up to three years.

30. **The Option ARM loans sold by Defendants all have the following uniform characteristics:**

(a) There is an initial low interest rate or "teaser" rate that was used to entice the borrower into entering into the loan. The rate offered was typically 1% - 3%;

(b) The loan has a corresponding low payment schedule. The documentation provided intended to misleadingly portray to consumers that the low payments for the first several years were a direct result of the low interest rate being offered;

(c) The initial payments in the required disclosures were precisely the amount that would be required to pay both interest and principal in a fully amortized 30 year loan based upon the low interest rate being offered. The purpose was to assure that if someone were to calculate what the payment would be at the low offered interest rate, it corresponded to the payment schedule. This portrayal was intended to further mislead consumers into believing that the payments were enough to cover all principal and interest;

(d) The payment has a capped annual increase on the payment amount; and

(e) A substantial number of the loans include a prepayment penalty preventing consumers from securing a new loan for a period of up to three years.

31. Defendants uniformly failed to disclose to, and by omission, failed inform to consumers, including Plaintiffs and Class members, in a clear and conspicuous manner that the "teaser" rate offered by Defendants was actually a discounted rate and only

7

applied to the loans for thirty (30) days. Thereafter, the true interest charged on the loans was significantly higher than the promised rate.

32. Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiffs and Class members, that the payments set forth in the TILDS were insufficient to cover the actual charges and that this was, in fact, a loan that would cause Plaintiffs and Class members to lose the equity they had in their homes.

33. Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiffs and Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

34. Disclosing whether a payment will result in negative amortization is of critical importance to consumers. If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is a loss of equity. Defendants, and each of them, are, and at all relevant times hereto have been, aware that clear and conspicuous disclosure of the actual interest rate and a payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important, material information.

35. At all relevant times, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiffs and Class members was insufficient to pay both interest and principal; (ii) that negative amortization was substantially certain to occur if Plaintiffs and Class members made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' and Class members' residences was substantially certain to occur if Plaintiffs and Class members made payments according to the

payment schedule provided by Defendants.

36. In spite of their knowledge, Defendants sold their Option ARM loans as a product that would provide Plaintiffs and Class members with a low interest rate for the first three to five years of the loan, and at all relevant times, failed to disclose and/or concealed this information by making partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur. This concealed and omitted information was not known to Plaintiffs and Class members. Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note and the payment amounts set forth by Defendants were insufficient to pay both principal and interest, negative amortization occurred.

37. The true facts about Defendants' Option ARM loans are that they do not provide the low interest rate promised and they are certain to result in negative amortization.

38. Disclosure of a payment rate that is sufficient to pay both principal and interest on the loans is of critical importance to consumers. If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur. Defendants, and each of them are, and at all relevant times have been, aware that the ability of the disclosed payment rate to pay both principal and interest so as to avoid negative amortization is one of the most important terms of a loan.

39. To this day, Defendants continue to conceal material information from consumers and the public that: (i) the payment amounts on the payment schedules provided to Plaintiffs and Class members are and were insufficient to pay both principal and interest; (ii) if the disclosed payment schedule is followed, Plaintiffs and Class members will suffer negative amortization; and (iii) loss of equity and/or loss of the property is substantially certain to occur if

the disclosed payment schedule is followed. Nevertheless, Defendants have refused to clearly and conspicuously disclose to Plaintiffs and Class members the existence of this important material information and the injury caused thereby, including but not limited to the loss of equity.

40. In the end, the harm caused by Defendants' failures to disclose and omissions, as alleged herein, grossly outweighs any benefit that could be attributed to them.

41. Knowing the truth and motivated by profit and market share, Defendants knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff and all others similarly situated.

42. Defendants' failures of disclosure regarding their Option ARM loans have resulted and will continue to result in significant loss and damage to Plaintiffs and Class members, including but not limited to the loss of equity these consumers have or had in their homes.

43. The facts which Defendants misrepresented and concealed, as alleged in the preceding paragraphs, were material to the decisions about whether to purchase Option ARM loans in that Plaintiffs and Class members would not have purchased these loans but for Defendants' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

44. Defendants' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether or not Plaintiffs and Class members would receive a home loan that would actually provide the low interest and payment rate, as promised, for the first three to five years of the loan that would be sufficient to pay both principal and interest.

45. Upon information and belief, at all relevant times during the liability period,

Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and nevertheless sold these Option ARM loans throughout the United States, including in the State of California.

The Fifth Cause of Action for Breach of Contract is alleged against all Defendants. After incorporating all preceding paragraphs by reference, the Fifth Cause of Action alleges:

179. Plaintiffs and Class members entered into written home loan agreements with American Home Mortgage Acceptance, Inc., which agreements were subsequently sold or assigned to American Home Mortgage Investment Trust 2005-2; American Home Mortgage Securities LLC; Deutsche Bank National Trust Company and Does 1-10. Defendant Wells Fargo Bank, N.A. is the "Master Servicer" on the loans at issue here and, in that capacity, is responsible for enforcing provisions of the Note relevant to this claim and applying Plaintiffs' and Class members' payments in the manner required by the Notes.

180. The Notes were drafted by Defendants and could not be modified by Plaintiffs or Class members due to Defendants' superior bargaining position. The Notes were offered to Plaintiffs and the Class on a take it or leave it basis. As such, the Notes at issue are contracts of adhesion. The Notes describe the terms and respective obligations applicable to the parties herein.

181. The Notes describe Plaintiffs' and Class members' interest rate on the loan as a low interest rate, typically between 1% and 3%. In addition, as required by federal law, Defendants provided a TILDS concerning the home loan agreement that shows a payment scheduled based on the that low 1% to 3% interest rate. For the first three to five years the payment schedule shows that Plaintiffs' and Class members' monthly payment obligations to Defendants are the exact payments necessary to pay off all principal and interest during the terms of the loans if, indeed, the interest rate

actually charged by Defendants on the loans was the low interest rate promised.

182. Defendants expressly and/or through their conduct and actions impliedly agreed that Plaintiffs' and Class members' monthly payment obligations would be sufficient to pay and would be applied to pay both the principal and interest owed on the loans. Defendants breached this agreement and never applied any of Plaintiffs' and Class members' payments to principal.

183. The written payment schedules provided to Plaintiffs reinforced the promise that Plaintiffs' and Class members' payments would be applied to both principal and interest. Those schedules show that the payment amounts owed by Plaintiffs and Class members in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest actually charged on the loan was the low interest rate promised. Had the Defendants done as promised, the payments would have been sufficient to pay both principal and interest.

184. Instead, Defendants immediately raised Plaintiffs' and Class members' interest rates and applied *no part* of Plaintiffs' or Class members' payments to the principal balances on their loans. In fact, because Defendants charged more interest than was agreed to, the payments, as disclosed by Defendants, were insufficient to cover the interest charge and thus principal balances increased (which is the negative amortization built into the loan).

185. Defendants breached the written contractual agreement by failing to apply any portion of Plaintiffs' and Class members' monthly payments towards their principal loan balances.

186. Plaintiffs and Class members, on the other hand, did all of the things the contract required of them. Plaintiffs and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by

Defendants.

187. As a result of Defendants' breach of the agreement, Plaintiffs and Class members have suffered harm. Plaintiffs and Class members have incurred additional charges to their principal loan balance. Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiffs and Class members in danger of losing their homes through foreclosure as Defendants have caused Plaintiffs' and Class members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

188. At all relevant times, there existed a gross inequality of bargaining power between the parties to the Option ARM loan contracts. At all relevant times, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon Plaintiffs and Class members extremely harsh, one-sided provisions in the contract, which Plaintiffs and Class members were not made aware of and did not comprehend (*e.g.*, Defendants' fraud and failures to clearly and conspicuously disclose as alleged herein), and which attempted to severely limit Defendants' obligations under the contracts at the expense of Plaintiffs and Class members, as alleged herein. As a result of these extremely harsh, one-sided provisions, including but not limited to the provisions which limit the "teaser" interest rate for one month or less, these provisions are unconscionable and therefore unenforceable.

189. WHEREFORE, Plaintiffs and Class members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

13

The Sixth Cause of Action for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing is alleged against the Trust, American Home Securities LLC, the Trustee and Does 1-10. After incorporating all preceding allegations, the Sixth Cause of Action alleges:

191. Defendants entered into or were the assignees of written agreements with Plaintiffs and Class members based on representations Defendants made directly and indirectly to Plaintiffs and Class members about the terms of their loans.

192. Defendants expressly represented to Plaintiffs and Class members that they would provide loans secured by Plaintiffs' and Class members' homes, and that the loans would have a promised fixed low interest rate for a period of three to five years.

193. Defendants also represented that if Plaintiffs and Class members made the monthly payments in the amount prescribed by Defendants, no negative amortization would occur. The Note expressly states and/or implies that Plaintiffs' and Class members' monthly payment obligation *will* be applied to pay both principal and interest owed on the loan.

194. The written payment schedules prepared by Defendants that were applicable to Plaintiffs' and Class members' loans, show that the payment amounts owed by Plaintiffs and Class members to Defendants in year one are exactly equal to the amount required to pay off the loan pursuant to an amortization schedule based upon the low interest rate promised. If Defendants acted as they promised, the payments would have been sufficient to pay both principal and interest.

195. Instead, Defendants immediately raised Plaintiffs' and Class members' interest rate and applied *no part* of Plaintiffs' and Class members' payments to principal. Moreover,

14

because Defendants charged more interest than was disclosed and agreed to in the loans, Plaintiffs' and Class members' payments were insufficient to cover the interest that Defendants charged resulting in an increase in the amount of principal Plaintiffs and Class members owed on their homes.

196. Defendants unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the contract. These loans will cost Plaintiffs and Class members thousands of dollars more than represented by Defendants. Plaintiffs and Class members did not receive the fixed low interest rate home loan promised them by Defendants. Defendants have caused Plaintiffs and Class members to lose equity in their homes and therefore have denied Plaintiffs and Class members the enjoyment and security of one of their most important investments.

197. Plaintiffs and Class members, on the other hand, performed all of the actions that the contract required of them. Plaintiffs and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

198. At all relevant times, Defendants unreasonably denied Plaintiffs and Class members the benefits promised to them under the terms of the Note, including but not limited to a low interest rate for the first three to five years of the loan, clear and conspicuous disclosure of a payment amount sufficient to pay both principal and interest so as to avoid negative amortization, and the other failures to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601, *et seq*., Regulation Z and FRB Commentary, as alleged herein.

199. Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or omissions to mislead and/or deceive Plaintiffs and others similarly situated as alleged herein.

200. Defendants' breaches, as alleged herein were committed with willful and wanton disregard for whether or not Plaintiffs or Class members would actually receive a home loan that would provide the promised low interest and payment rate for the first three to five years of the loan sufficient to pay both principal and interest.

201. Upon information and belief and at all relevant times, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and otherwise sold these Option ARM loans throughout the United States, including in the State of California.

202. Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and Class members.

203. At all relevant times, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

204. As a result of Defendants' conduct, Plaintiffs and Class members have suffered harm. Plaintiffs and Class members have incurred additional charges to their principal loan balance. Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class members' principal loan balance. Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and Class members in danger of losing their homes through foreclosure and, as a direct and proximate

result of said misconduct, caused Plaintiffs' and Class members' principal loan balances to increase, which has limited these consumers' ability to make their future mortgage payments or obtain alternative home loan financing.

205. WHEREFORE, Plaintiffs and Class members are entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

Defendants Wells Fargo and Deutsche Bank move to dismiss the Fifth and Sixth Causes of Action pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. The motion to dismiss is joined in by Investment Trust 2005-2.[1] Defendants contend that the Fifth and Sixth Causes of Action should be dismissed because the promissory note's express words refute the Complaint's allegations about the Option ARM loan agreement's terms and because California law does not recognize a claim for tortious breach of the duty of good faith except against an insurer.[2]

A.  <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729,

---

[1]Wells Fargo, Deutsche Bank, and Investment Trust 2005-2 are represented in this action by the same attorneys.

[2]Defendants do not move to dismiss the Fifth Cause of Action on the ground that they are not liable for the origination claims alleged in the Complaint (although they assert that they will "vigorously dispute" that liability at a later date in this action).

732 (9th Cir.2001).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.*, 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007).  "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic, id.* at 1964-1965.  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they

18

are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

      B. <u>DOCUMENTS ATTACHED TO COMPLAINT OR RELIED UPON</u>.

      All parties make extensive reference to documents referred to in the Complaint or to documents not attached to the Complaint but whose authenticity is not contested. No objection is made by the parties to these references.

      1. <u>Plaintiffs' Option ARM Note</u>.

      Attached to the Complaint as Exhibit 1 is Plaintiffs' Option ARM Note. The Note provides in relevant part:

> THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN <u>125.000%</u> OF THE ORIGINAL AMOUNT (OR $ <u>364,375.00</u>). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ <u>291,500.00</u>, plus any amounts added in accordance with Section 4(G) below, (this amount is called 'Principal'), plus interest, to the order of the Lender ....

**2. INTEREST**

Interest will be charged on unpaid Principal until the full amount has been paid.  First, I will pay interest at a yearly rate of <u>1.000</u> %.  The interest rate I will pay may change ....

**3. PAYMENTS**

   **(A) Time and Place of Payments**

   I will pay Principal and interest by making payments every month ....

   I Will make my monthly payments on <u>1st</u> day of each month beginning on <u>August, 2005</u>.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied to interest before Principal.  If, on <u>July 1, 2033</u>, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the 'Maturity Date.'

   ...

   **(B) Amount of My Initial Monthly Payments**

   Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ <u>937.57</u>, unless adjusted at an earlier time under Section 4(H) of this Note.

   **(C) Payment Changes**

   My monthly payment will be recomputed, according to Sections

4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and Interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the 1st day of <u>August, 2005</u>, and on that day every month thereafter. Each such day is called a 'Change Date.'

**(B) The Index**

On each Change Date, my interest rate will be based on an Index.  The 'Index' is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled 'Selected Interest Rates (H. 15)(the "Monthly Yields').  The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available at the 15 days before each interest rate Change Date is called the 'Current Index.' ....

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding <u>Three and 440 Thousandths</u> percentage points <u>3.440</u> % ('Margin') to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date ....

**(D) Interest Rate Limit**

21

My interest rate will never be greater than <u>Nine and 950 Thousandths</u> percentage points <u>9.950</u> % ('Cap') ....

(E) Payment Change Dates

Effective every year commencing <u>August 1, 2006</u>, and on the same date each twelfth month thereafter ('Payment Change Date'), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments.  The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my Payments are changed earlier under Section 4(H) of this Note.

(F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a Payment Change Date, will be limited to 7½ % more or less than the amount I have been paying.  This payment cap applies only to the principal payment ....

(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest

22

portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

    **(H) Limit on My Unpaid Principal; Increased Monthly Payment**

    My unpaid principal can never exceed a maximum amount equal to <u>125.000 %</u> of the principal amount originally borrowed.  In the event that my unpaid Principal would otherwise exceed that <u>125.000 %</u> limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7½ % annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal amounts.

    2.   <u>Truth-In-Lending Disclosure Statement</u>.

Also attached to the Complaint as an exhibit is the Truth-In-Lending Disclosure Statement, which provides in pertinent part:

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT: American Home Mortgage Acceptance, Inc.
1500 W. Shaw Avenue, Suite 403
Fresno, CA 93711

☐ Preliminary ☒ Final
DATE: 06/22/05
LOAN NO.:
Type of Loan: Conventional
APP NO.: 0000898255

BORROWERS: Elvin Valenzuela
Phyllis Valenzuela

ADDRESS: 5522 West Perez Avenue
CITY/STATE/ZIP: Visalia, CA 93291
PROPERTY: 5522 West Perez Avenue
Visalia, CA 93291

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 6.067 % | $ 385,457.34 | $ 286,015.22 | $ 671,472.56 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 12 | $937.57 | August 1, 2005 | 12 | $1,407.89 | August 1, 2006 |
| 12 | $1,083.48 | August 1, 2007 | 12 | $1,164.74 | August 1, 2008 |
| 12 | $1,252.10 | August 1, 2009 | 299 | $2,120.41 | August 1, 2010 |
| 12 | $2,020.61 | July 1, 2005 | | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This Loan has a Variable Rate feature. Variable Rate Disclosures have been provided to you earlier.
THE CURRENT INDEX RATE IS 2.504%

SECURITY: You are giving a security interest in the property located at:
5522 West Perez Avenue
Visalia, CA 93291

ASSUMPTION: Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $

PROPERTY INSURANCE: ☒ Property hazard insurance in the amount of $ 291,500.00 with a mortgage clause to the lender is a required condition on this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender. Hazard insurance ☐ is ☒ is not available through the lender at an estimated cost of N/A for a year term.

LATE CHARGES: If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding nonpayment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

## 3. Truth in Lending Act ("TILA")'s Requirements for ARM Loans.

12 C.F.R. § 226.19(b) provides that, "[i]f the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year," disclosure must be provided at the time an application form is provided or before a consumer pays a non-refundable fee of the following: (1) The booklet entitled *Consumer Handbook on Adjustable Rate Mortgages* published by the Board and the Federal Home Loan Bank Board, or a suitable substitute; and (2) a loan program disclosure for each variable-rate program in which the consumer expresses an interest. 12 C.F.R. § 226.19(b)(1) & (2).

### a. Federal Reserve Board's Consumer Handbook on Adjustable Rate Mortgages.

Defendants request the Court take judicial notice of the Federal Reserve Board's Consumer Handbook on Adjustable Rate Mortgages ("Consumer Handbook") and the Adjustable Rate Mortgage Loan Disclosure Statement attached to Defendants' motion to dismiss as Exhibit A.[3]  Page 1 of the Consumer Handbook states:

> Adjustable-rate mortgages (ARMs) are loans with interest rates that change.  ARMs may start with lower monthly payments than fixed-rate mortgages, but keep the following in mind:
>
> • Your monthly payments could change.  They

_____

[3]Plaintiffs do not dispute that they were given copies of both of these documents.

25

could go up - sometimes by a lot - even if the interest rates don't go up.  See page 20.

● Your payments may not go down much, or at all - even if interest rates go down.  See page 11.

● You could end up owing more money than you borrowed - even if you make all your payments on time.  See page 22.

Page 13 of the Consumer Handbook, in the section captioned "Payment Caps," states:

In addition to interest-rate caps, many ARMs - including payment-option ARMs - limit, or cap, the amount your monthly payment may increase at the time of each adjustment.  For example, if your loan has a payment cap of 7½%, your monthly payment won't increase more than 7½% over your previous payment, even if interest rates rise more.  For example, if your monthly payment in year 1 of your mortgage was $1,000, it could only go up to $1,075 in year 2 (7½% of $1,000 is an additional $75).  Any interest you don't pay because of the payment cap will be added to the balance of your loan.  A payment cap can limit the increase to your monthly payments but also can add to the amount you owe on the loan.  (This is called *negative amortization*, a term that is explained on page 22.)

Page 17 of the Consumer Handbook, in the section captioned "Payment-option ARMs," states:

The interest rate on a payment-option ARMS is typically very low for the first few months (for example, 2% for the first 1 to 3 months).  After that, the interest rate usually rises to a rate closer to that of other mortgage loans.  Your payments during the first year are based on the initial low rate, meaning that if you only make the minimum payment each month, it will not reduce the amount you owe and it may not cover the interest due.  The unpaid interest is added to the amount you owe on the mortgage, and your loan balance increases.

26

This is called *negative amortization*.  This means that even after making many payments, you could owe more than you did at the beginning of the loan.  Also, as interest rates go up, your payments are likely to go up.

Pages 22 and 23 of the Consumer Handbook, captioned "Negative Amortization - When you owe more money than you borrowed," states:

Negative amortization means that the amount you owe increases even when you make all your required payments on time.  It occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage - the unpaid interest is added to the principal on your mortgage, and you will owe more than you originally borrowed.  This can happen because you are making only minimum payments on a payment-option mortgage or because your loan has a payment cap.

For example, suppose you have a $200,000, 30-year payment-option ARM with a 2% rate for the first 3 months and a 6% rate for the remaining 9 months of the year.  Your minimum payment for the year if $739.24, as shown in your previous graph.  However, once the 6% rate is applied to your loan balance, you are no longer covering the interest costs.  If you continue to make minimum payments on this loan, your loan balance at the end of the first year of your mortgage would be $201,118 - or $1,118 more than you originally borrowed.

Because payment caps limit only the amount of payment increases, and not interest-rate increases, payments sometimes do not cover all the interest due on your loan.  This means that the unpaid interest is automatically added to your debt, and interest may be charged on that amount.  You might owe the lender more later in the loan term than you did at the beginning.

A payment cap limits the increase in your

27

monthly payment by deferring some of the
interest.  Eventually, you would have to
repay the higher remaining loan balance at
the interest rate then in effect.  When this
happens, there may be a substantial increase
in your monthly payment.

Some mortgages include a cap on negative
amortization.  The cap typically limits the
total amount you can owe to 110% to 125% of
the original loan amount.  When you reach
that point, the lender will set the monthly
payment amounts to fully repay the loan over
the remaining term.  Your payment cap will
not apply, and your payments could be
substantially higher.  You may limit negative
amortization by voluntarily increasing your
monthly payment.

Be sure you know whether the ARM you are
considering can have negative amortization.

            b.    ARM Loan Disclosure Statement.

American Home Mortgage Company's Adjustable Rate Mortgage

Loan Disclosure Statement states:

HOW YOU INTEREST RATES AND PAYMENT ARE
DETERMINED

...

Your Initial Interest Rate may be an amount
which is lower than the sum of the Margin
plus the Index published.  (This is called a
'Discounted Rate.') If your Initial Interest
Rate is a Discounted Rate, at the first
interest rate adjustment you rate may
increase even if the Index remains the same
or decreases ....

Your initial monthly payment amount will be
established by calculating the amount
necessary to pay the loan off in full
(principal and interest) at the maturity date
in substantially equal installments of
principal and interest, based on the loan
balance, term, and the Initial Interest Rate
in effect at the time of loan closing and
assuming that such interest rate will remain

in effect throughout the loan term.

**HOW YOUR INTEREST RATE AND MONTHLY PAYMENT CAN CHANGE**

...

e.   Increase in Principal Balance (Negative Amortization): The principal balance on your loan can increase even though you are making the required monthly payments.  This is called 'Negative Amortization.'  This can happen if, as a result of adjustments in the interest rate, the required monthly payment is insufficient to pay the amount of the interest that is then due.  In that event, the accrued but unpaid interest that is not included as part of the monthly payment will be added each month to the principal balance of the loan and will accrue interest at the interest rate that is in effect during that month.

If your monthly payment is not sufficient to pay monthly interest, you may take advantage of the negative amortization feature by letting the interest defer and become part of the principal balance to be paid by future monthly payments, or you may also choose to limit any negative amortization by increasing the amount of your monthly payment or by paying any deferred interest in a lump sum at any time.

C.   <u>Fifth Cause of Action for Breach of Contract</u>.

Defendants move to dismiss the Fifth Cause of Action for breach of contract on the ground that the promissory note's express words refute the allegations about the Option ARM loan agreement's terms.

1.   <u>Standards Governing Breach of Contract Claims</u>.

The elements of a claim for breach of contract are: (1) the contract; (2) Plaintiff's performance; (3) Defendant's breach; (4) Damage to Plaintiff.  *See McDonald v. John P. Scripps*

29

*Newspaper*, 210 Cal.App.3d 100, 104 (1989).

Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous. *Monaco v. Bear Stearns Residential Mortgage Corp.,* 554 F.Supp.2d 1034, 1040 (C.D.Cal.2008); *see also Westlands Water Dist. v. U.S. Dept. of Interior,* 850 F.Supp. 1388, 1408 (E.D.Cal.1994)("A motion to dismiss cannot be granted against a complaint to enforce an ambiguous contract."). A contract provision is ambiguous when it is capable of two or more constructions both of which are reasonable. *Bay Cities Paving & Grading, Inc. v. Lawyers Mutual Ins. Co.,* 5 Cal.4th 854, 867 (1993). Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. *Id.* Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. *Id.; see also Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992).[4] Under California law, "[t]he whole

---

[4]The Fifth Cause of Action alleges that the Option ARM is a contract of adhesion. "'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" *Armendariz v. Foundation Health Psychcare Services, Inc.,"* 24 Cal.4th 83, 113 (2000). "[A] contract of adhesion is fully enforceable according to its terms," except that "[t]he rule requiring the resolution of ambiguities against the drafting party 'applies with peculiar force in the case of a contract of adhesion.'" *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 819 & n.16 (1981). However, "[t]here are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him ... The second - a principle

of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir.2008), citing California Civil Code § 1641. "A contract must be so interpreted to give effect to the mutual intentions of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." *Id.,* citing California Civil Code § 1636. "It is well settled that '[w]here there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.'" *Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir.1992), *cert. denied,* 507 U.S. 914 (1993).

> 2. <u>Monthly Payments Applied To Principal As Well as Interest</u>

Defendants argue that the Promissory Note does not promise that each of Plaintiffs' monthly payments will be applied to principal as well as interest on the loan. Plaintiffs rely on the following sentences from Paragraph 3(A) & (B) of the Promissory Note:

> I will pay principal and interest by making payments every month.
>
> . . .

---

of equity applicable to all contracts generally - is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" *Id.* at 819-820.

>Each of my monthly payments until
>the first Payment Change Date will be in the
>amount of U.S. $ <u>937.57</u>, unless adjusted at
>an earlier time under Section 4(H) of this
>Note.

Defendants argue that the provisions do not support Plaintiffs' claims for two reasons.

First, Defendants argue, neither of these provisions impose any obligation on the Note Holder: "Since the quoted sentences impose no obligation on defendants, defendants could not have breached them."

Plaintiffs respond that Defendants' contention is "illogical", arguing that "[i]f Plaintiffs were required to pay principal and interest, then how could Defendants not be required to apply those payments correctly to principal and interest?"

Plaintiffs contention is misplaced. The Promissory Note sets forth specific provisions for the application of monthly payments to principal and interest. Neither Paragraph 3(A) or 3(B) impose an obligation on Defendants to apply each payment to principal and interest.

Secondly, Defendants contend, neither Paragraph 3(A) or 3(B) promise that each monthly payment will be applied to principal as well as interest and do not address the subject of payment application at all. Other provisions of the Promissory Note address payment application specifically, the statement in Paragraph 3(A) that "[e]ach monthly payment will be applied to interest before Principal." Defendants contend: "Implicitly, if a payment is applied to interest first and unpaid interest

exceeds the payment amount, none of the payment will be left to apply to loan principal." Defendants also refer to the sentence in Paragraph 4(G) of the promissory note: "For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the amount of the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal ...."

As Defendants argue, that these provisions deal specifically with payment application and even more specifically with application of payments which are less than the monthly accrued interest and refute any notion that the Note Holder must apply any of the monthly payment to loan principal in that circumstance. Defendants contend:

> If there were any inconsistency between these specific payment application provisions and the above-quoted sentences on which plaintiffs rely, the provisions dealing specifically with payment application would prevail over the general statements on which plaintiffs rely. But, of course, there is no inconsistency. The borrower's promise to pay is entirely separate from the Note Holder's obligation to apply those payments in a particular manner. Plaintiff's sentences address their payment obligation; the note's other provisions govern the Note Holder's obligation to apply those payments to specific charges. The two sets of provisions are thus easily harmonized, giving separate effect to each.

Plaintiff responds that the sentence in Paragraph 3(A), "I will pay principal and interest by making payments every month," promises that Plaintiffs' monthly payments would be applied to both principal and interest or is at least ambiguous as to

33

whether interest and principal would be satisfied by each monthly payment.  Plaintiffs cite *Reyes v. Downey Savings and Loan Ass'n, F.A.,* 541 F.Supp.2d 1108, 1116 (C.D.Cal.2008):

> Plaintiffs demonstrate that the loan contract states, 'I will pay Principal and interest by making a payment every month.' ... This could easily be understood to mean that, if Plaintiffs made payments every month, their payments would be applied to both principal and interest.  Plaintiffs have alleged that they were led to understand the contract in that way, and that Defendants breached that contract.  Thus, Plaintiffs have sufficiently alleged that the terms of the contract were ambiguous.

Plaintiffs also cite *Monaco v. Bear Stearns Residential Mortgage Corp., supra,* 554 F.Supp.2d at 1041-1042:

> As to Plaintiffs' second claim - that Defendants breached the Note by not applying monthly payments to principal and interest - the Court finds that the relevant contractual language is ambiguous in the context of the Note as a whole.  Section 3 states 'I will pay principal and interest by making a payment every month.'  According to Plaintiffs, one could reasonably interpret this statement to mean that payments will be applied to both principal and interest, in spite of later statements in the Note that negative amortization is a possibility.  Defendants contend that the only reasonable interpretation of the statement is that it describes Plaintiffs' *obligation* to make payments, leaving the question of how those payments will be *applied* to other sections.  The Court agrees with Plaintiffs.
>
> First, the meaning Defendants would ascribe to the statement would likely render it superfluous in light of other provisions in Section 3, a result that is to be avoided. *See* Cal. Civ. Code § 1641 ('The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret

34

the other.') Immediately below the disputed statement is the following provision: 'I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.' The Court finds that this latter statement more accurately describes Plaintiffs' payment obligations. On this basis, it is certainly reasonable, if not preferred, to interpret the former disputed statement along the lines suggested by Plaintiffs.

Second, later provisions of the Note arguably support Plaintiffs' interpretation. In Section 5(F), the Note describes three additional payment options, which speak specifically to the question of how payments are to be allocated between interest and principal. Two of these payment options are for amortized payments, and they are described as follows: 'Pay the amount necessary to pay the loan off (Principal and interest) ....' This language is quite similar to the language employed in Section 3: 'I will pay principal and interest ....' On this basis, one could reasonably conclude that the statement in Section 3 refers to an amortized payment plan.

Third, in light of the Court's finding that the Note is ambiguous as to the applicable interest rate that will apply, one could reasonably conclude that monthly payments will amortize the loan. Indeed, were the interest rate to remain at 1%, a possibility under Section 3 of the Note as discussed above, the initial monthly payment would fully amortize the loan.

For the above reasons, the Court finds that, despite language in the Note indicating that negative amortization is a possibility,[11] one could reasonably conclude that monthly payments will be applied to both principal and interest.

Defendants' Motion to Dismiss on this basis is thus DENIED.

[11] Just as the Note uses the term 'may' to

35

warn of an interest rate change that is
certain to occur, the Note describes negative
amortization as a possibility when in fact it
is certain to occur under the terms set by
Defendants.  At the top of the Note's first
page, the borrower is warned that the Note
'may require' - as opposed to, more
accurately, 'will require' - unpaid interest
to be added to loan principal.  Defendants
have drafted a Note that creates uncertainty
about its provisions and that precludes the
Court from ascertaining the intent of the
parties solely on the basis of the written
instrument.

Plaintiffs argue that the decisions in *Plascencia v. Lending 1st Mortgage,* 2008 WL 4544357 (N.D.Cal.2008); *Amparan v. Plaza Home Mortgage, Inc.*, 2008 WL 5245497 (N.D.Cal.2008); and *Quezada v. Loan Ctr. of Cal., Inc.*, 2008 WL 5100241 (E.D.Cal.2008), are incorrectly decided and ignore the Notes' plain meaning, which would deprive them of legal effect, citing California Civil Code § 1643 ("A contract must receive such interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.").

In *Plascencia,* the Northern District held that the reliance on the provision "I will pay principal and interest by making payments every month" in Section 3(A) of the Note to make the contract ambiguous was without merit:

Although the Court has held that Plaintiffs
may be able to show that, considered as a
whole, the disclosures provide confusing and
seemingly contradictory information
concerning the terms of the loan, the
disclosures nonetheless accurately describe
the relationship between the minimum monthly
payment and the accrued interest.  The

Agreement states that each monthly payment 'will be applied to interest before Principal.' *Id.* It states elsewhere that the 'monthly payment could be less than or greater than the amount of interest each month.' *Id.* § 5(C).

The Agreement thus contains no promise, express or implied, that Plaintiffs' payment would always be applied to both principal and interest. Whether the payment would be applied to principal depended on whether it was large enough to cover the entire amount of interest that had accrued during the preceding month. Because Plaintiffs could choose to pay more than the minimum payment, they had the option of making payments large enough to reduce their principal each month. Plaintiffs do not allege that they actually made payments that were greater than the amount of accrued interest, and the EMC nonetheless failed to apply the payments to principal. If this were the case, they would have stated a breach of contract claim. As the complaint now stands, they have not. Accordingly, the breach of contract claim is dismissed.

*Amparan v. Plaza Home Mortgage, Inc.*, followed *Plascencia* in dismissing the breach of contract claim. In *Quezeda,* Judge Shubb ruled:

Plaintiff's second ground for breach of contract relies on the following provision in the Note: 'I will pay principal and interest by making a payment every month.' (*Id.* §3(A).) Plaintiff alleges that this provision is a promise by defendants to apply a portion of each monthly payment to her principal balance ....

When read in isolation, this provision may be susceptible to plaintiff's interpretation; however, under California contract law, '[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' *Novarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir.2008)

37

(quoting Cal. Civ. Code § 1641).
Furthermore, '[i]t is well settled that
"[w]here there is an inconsistency between
general provisions and specific provisions
[in a contract], the specific provisions
ordinarily qualify the meaning of the general
provisions."' *Pecarovich v. Allstate Ins.
Co.*, 309 F.3d 652, 658 (9th Cir.2002)(quoting
*Brinderson-Newberg Joint Venture v. Pac.
Erectors, Inc.*, 971 F.2d 272, 278 (9th
Cir.1992) ....

The Note contains several specific provisions
that contradict plaintiff's interpretation.
In section 4(G), the Note provides the
following language under the heading 'Changes
to My Unpaid Principal Due to Negative
Amortization or Accelerated Amortization':

> [M]y monthly payment could be less
> or greater than the amount of the
> interest portion of the monthly
> payment that would be sufficient to
> repay the unpaid Principal ... For
> each month that the monthly payment
> is less than the interest portion,
> the Note Holder will subtract the
> monthly payment from the amount of
> the interest portion and will add
> the difference to my unpaid
> Principal ....

In addition, at the top of the first page fo
the Note, the following text appears in bold
typeface: 'MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE
PRINCIPAL AMOUNT I MUST REPAY BEING LARGER
THAN THE AMOUNT I ORIGINALLY BORROWED.' (*Id.*
at 1.)

Collectively, these provisions indicate that
monthly payments could be insufficient to
cover the interest owed on the OARM.  If
monthly payments fell below the interest
owed, the Note Holder would apply the payment
to the interest owed and add the difference
to the principal balance.  In light of these
provisions, it would be unreasonable to
interpret the language "I will pay principal
and interest by making a payment every
month,' as requiring defendants to

38

necessarily apply a portion of each monthly payment toward plaintiff's principal balance. Rather, consistent with the provision's location under the heading 'Time and Place of Payments,' it is properly viewed as describing the timing of loan payments, not dictating how the Note Holder will distribute payments to principal or interest. *See City of El Cajon v. El Cajon Police Officers' Ass'n,* 49 Cal.App.4th 64, 71 ... (1996)('When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument ... reasonable and capable of being carried into effect ....' ....).

Accordingly, because plaintiff's Note is not reasonably susceptible to the only interpretation giving rise to her breach of contract claim, plaintiff's breach of contract claim must be dismissed.

Plaintiffs further argue that other provisions of the promissory note "create the impression that the payments made by Plaintiffs pursuant to the Note were fully amortizing payments." Plaintiffs refer to Paragraph 3(B):

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ <u>937.57</u>, unless adjusted at an earlier time under Section 4(H) of this Note.

Plaintiffs argue that, although Paragraph 3(B) does not indicate how many monthly payments would be fixed at $937.57, "it clearly contemplates more than one payment would be fixed at that amount (because it uses the term 'monthly payments,' rather than 'monthly payment')." Plaintiff contends that Loan Disclosure Statement attached to Defendants' motion as Exhibit B states that

Plaintiffs' initial monthly payment would be a fully amortizing payment because of the statement in the Loan Disclosure Statement:

> Your initial monthly payment amount will be established by calculating the amount necessary to pay the loan off in full (principal and interest) at the maturity date in substantially equal installments of principal and interest, based on the loan balance, term, and the Initial Interest Rate in effect at the time of loan closing and assuming that such interest rate will remain in effect throughout the loan term.

Plaintiffs argue:

> Thus, since Plaintiffs' monthly payment in the second month remained at $937.57, Paragraph 3(B) indicates that the low monthly payments for the first five years of the loan were fully amortizing payments. After all, if the first month's payment at $937.57 was fully amortizing, there would be no reason why that same payment amount would not be fully amortizing in months two, three, four and so on. Indeed, this is further reinforced by Paragraph 3(A)'s statement that Plaintiff will pay 'principal and interest' by making those monthly payments, and by Paragraph 8(A)'s provision for calculating late payment charges, which provides that '[T]he amount of the charge will be 5.000% of my overdue payment of principal and interest.'

> Once the payment amount did change (after 12 months), it increased by 7.5% pursuant to the payment cap in the Note. Naturally, if a borrower had reason to believe that the monthly payments for the first year would be applied to principal and interest, he or she would also believe that an increased payment would also be applied to principal and interest. Moreover, even though the monthly payment amount changed, the Note once again represents that the new payment will by fully amortizing. Paragraph 4(E) of Plaintiffs' Note, entitled 'Payment Change Dates,' states

40

that '[e]ffective every year commencing August 1, 2006, and on the same date each twelfth month thereafter ('Payment Change Date'), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe.' ... Accordingly, as the Loan Disclosure Statement stated that Plaintiffs' initial monthly payment would be a fully amortizing payment and Plaintiffs' Note states that the initial monthly payment amount of $937.57 would not change for the first year, the loan documents would cause a reasonable consumer to reasonably believe that the subsequent payment amounts provided in the TILDS would also be fully amortizing payments.

Defendants reply that Plaintiffs' reliance on Paragraph 3(B) to establish ambiguity is misplaced:

[P]laintiffs pluck another snippet of contractual language from context, claiming to find ambiguity in § 3(B)'s statement that each of their monthly payments will be in the amount of $937.57 until the first payment change date ... Pairing this provision with a statement in the loan disclosure that the initial payment is set at an amount that would fully amortize the loan *if* the initial interest rate remained in effect throughout the entire loan term, plaintiffs assert that the initial payment amount must be 'fully amortizing' for at least the first year, if not longer ....

This argument overlooks the obvious 'if.' The disclosure statement says that the initial payment amount would be 'fully amortizing' only 'if' the initial interest rate remained in effect throughout the entire loan term. The initial interest rate did *not* remain in effect, however. So the initial payment amount was not fully amortizing, and plaintiffs' argument built on that false foundation collapses.

After detailed review, the terms of the Promissory Note, taken as a whole, do not support Plaintiffs' contention that

Defendants promised that each monthly payment on the loan would be applied to principal and interest.  The express terms of the Promissory Note belie such an interpretation.  Plaintiffs' argument that the Promissory Note is at least ambiguous in this regard is without merit.  Plaintiffs' attempts to manufacture an ambiguity by focusing on small excerpts of the Promissory Note's provisions without construing the Promissory Note as a whole are without merit.

3.  <u>Failure to Apply Correct Interest Rate</u>.

Defendants move to dismiss the claim for breach of contract that Defendants failed to apply the introductory 1.000% interest rate for a period of three to five years.

Defendant refers to Paragraphs 2 and 4(A) of the promissory note:

2.  INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid.  First, I will pay interest at a yearly rate of <u>1.000</u> %.  The interest rate I will pay may change ....

...

4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may further change on the 1st day of <u>August, 2005</u>, and on that day every month thereafter. Each such day is called a 'Change Date.'

Plaintiffs argue that Defendants's actions were not authorized by generalized statements in the Note that the

interest rate "may change."  Plaintiffs rely on *Monaco v. Bear*
*Stearns Residential Mortgage Corporation, supra*, 554 F.Supp.2d at
1040-1041:

> As to Plaintiffs' first claim - that
> Defendants breached the Note by immediately
> raising the 1% fixed interest rate - the
> Court finds that the language governing the
> interest rate Plaintiffs must pay is
> ambiguous.  Section 2 of the Note states that
> Plaintiffs 'will pay' interest at a yearly
> rate of 1% but that this rate 'may change'
> pursuant to Section 4.  However, Section 4
> states that the interest rate 'will change'
> in the first payment due date and that it
> 'will never be lower that 3.500%.'  Section 4
> is thus inconsistent with Section 2, whereas
> Section 2 states that a change in the
> interest rate is a mere possibility, Section
> 4 states that it is an absolute certainty.[9]
> Because the Court is to strive to 'give
> effect to every provision' of a contract ...,
> the Court concludes that the Note is
> reasonably susceptible to the interpretation
> that Section 4 applies and to the
> interpretation that Section 4 may not
> apply.[10]
>
> [9] To be consistent with Section 4, Section 2
> should state that the 1% interest rate 'will'
> - not 'may' - change in accordance with
> Section 4.  Despite Defendants' urging, the
> Court will not read 'may' to mean 'will,' as
> the Court is unable to determine on the basis
> of the Note whether the parties mutually
> intended for Section 4 to apply.  The
> uncertainty created by the use of the term
> 'may' will therefore be 'interpreted most
> strongly against' Defendants - 'the party who
> caused uncertainty to exist.'  Cal. Civ. Code
> § 1654.
>
> [10] 'Parol evidence may be admitted to explain
> the meaning of a writing when the meaning
> urged is one to which the written contract is
> reasonably susceptible or when the contract
> is ambiguous.' ... Plaintiffs allege that
> 'Defendants impliedly and expressly
> represented to Plaintiffs and Class members

43

> that ... said loans would have a fixed
> interest rate equal to a low promised
> interest rate for a period of three (3) to
> five (5) years.' ... Because the Note is
> ambiguous as to the applicability of Section
> 4, parol evidence is admissible to ascertain
> the intent of the parties.  On the basis of
> the allegations in the First Amended
> Complaint, Plaintiffs have put forth facts
> sufficient to state a claim for relief.

Defendants reply that Plaintiff's claim that Defendants promised the interest rate would not change for a period of three to five years is inconsistent with the terms of the promissory note.  Defendants point out that the introductory sentence to the Note states: "THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT."  Section 2 reiterates that "The interest rate I will pay may change."  Defendants argue that Section 4(A) makes clear that the rate change may occur well before the end of the loan's third or fifth year: "The interest rate I will pay may further change on the 1st day of August, 2005, and on that day every month thereafter."  Defendants contend that Plaintiffs' attempt to find an ambiguity because of the word "may" is not supported by Sections 4(B) and (C):

> This difference creates no ambiguity ...
> There is no 'other' meaning to which the note
> is reasonably susceptible.  The note states
> unequivocally that the interest rate may
> change on August 1, 2005; if the math makes
> change certain, it merely increases the
> likelihood of the possibility that 'may'
> applies.  The two provisions are not
> inconsistent.
>
> Even if the difference between 'may' and
> 'will' created some uncertainty, it would not

help plaintiffs. Their proposed
interpretation is inconsistent with both
'may' and 'will.' They claim the note means
'will not' - the interest rate 'will not'
change on August 1, 2005 or on the first of
the next 36-60 months either. That meaning
is completely contrary to both §§ 2 and 4(A)
which state that the interest rate 'may'
change on each of those occasions, and §§
4(B) and (C) which indicate that the interest
rate will certainly change on August 1, 2005.

In other words, even if the note left a doubt
as to how certain interest rate change was,
it left no doubt that change was possible.
Plaintiffs' reading, which denies that
possibility, is completely inconsistent with
the note's plain language and so is not a
meaning of which the note is reasonably
susceptible.

...

In addition to contradicting the note's clear
terms, plaintiffs' interpretation leads to a
clearly unreasonable result. Plaintiffs
could not reasonably have expected to receive
a home loan at 1% interest rate for three to
five years at a time when the Fed Funds rate
was 3.25% and the Federal Reserve Board's
discount rate was 4.35%.

Plaintiffs have not established that the Promissory Note is
ambiguous. Plaintiffs' contention that the Promissory Note is
reasonably susceptible to the interpretation that the interest
rate would remain the same for a period of three to five years
relies on a nitpicking interpretation of two of the note's
provisions and ignores the context of the Promissory Note as a
whole. Plaintiffs' interpretation is not reasonable under the
law governing the construction of contracts set forth above.[5]

_____

[5]In their opposition brief, Plaintiffs argue that the
disclosures in the promissory note violate the Truth in Lending

Defendants' motion to dismiss the Fifth Cause of Action is GRANTED WITHOUT LEAVE TO AMEND.

D. **SIXTH CAUSE OF ACTION FOR TORTIOUS BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**.

Defendants move to dismiss the Sixth Cause of Action for tortious breach of the implied covenant of good faith and fair dealing for failure to state a claim.

Because the motion to dismiss the Fifth Cause of Action for breach of contract has been granted, Plaintiffs' claim for tortious breach of the implied covenant necessarily fails. *See Gus v. Bechtel Nat. Inc.,* 24 Cal.4th 317, 349-350 (2000):

> The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made* ... The covenant thus cannot '"be endowed with an existence independent of its contractual underpinnings."' ... It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

However, even if the Fifth Cause of Action survived, the Sixth Cause of Action fails to state a claim upon which relief can be granted.

---

Act. Although Defendants reply that the Truth in Lending Act requires disclosures in the disclosure statement and adjustable rate loan program disclosure statement, not the promissory note, these issues are irrelevant to the motion to dismiss seeking dismissal of the breach of contract and tortious breach of the implied covenant, not the cause of action for violation of the Truth in Lending Act. The Court expresses no opinion with respect to the parties contentions regarding the requirements of the Truth in Lending Act.

"Generally, no cause of action for the tortious breach of the implied covenant of good faith and fair dealing can arise unless the parties are in a 'special relationship' with 'fiduciary characteristics.'" *Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*, 307 F.3d 944, 955 (9th Cir.2002), *citing Mitsui Mfts. Bank v. Superior Court*, 212 Cal.App.3d 726 (1989). "[T]he implied covenant tort is not available to parties of an ordinary commercial relationship where the parties deal at arms' length." *Id.* "A central test of whether a lender is subject to this tort is whether there is 'a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other.'" "[A] lender ... owes a fiduciary duty to a borrower when it excessively controls or dominates the borrower." *Id.*

Defendants cite numerous cases holding that a lender owes no fiduciary duty to a borrower.

In *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal.App.3d 1089 (1991), a property owner brought an action against a lending institution alleging negligence in the institution's appraisal of property used as security for the loan. The Court of Appeal noted:

> To the extent this cryptic allegation may be construed as pleading a breach of fiduciary duty, it fails as a matter of law. The relationship between a lending institution and its borrower-client is not fiduciary in nature. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476-478 ...). A commercial lender is entitled to pursue its own economic interests in a loan transaction.

47

> (*Kruse v. Bank of America* (1988) 202
> Cal.App.3d 38, 67 ...).  This right is
> inconsistent with the obligations of a
> fiduciary which require that the fiduciary
> knowingly agree to subordinate its interests
> to act on behalf of and for the benefit of
> another.  (*Committee on Children's
> Television, Inc. v. General Foods Corp.*
> (1983) 35 Cal.3d 197, 221 ...).

231 Cal.App.3d at 1093 n.1.

Plaintiffs do not contradict this line of authority.
Rather, they cite *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11
Cal.4th 85, 102 (1995), and contend that tort recovery for breach
of contract is permissible where there is a violation of an
independent duty arising from principles of tort law.

In *Freeman & Mills*, an oil company retained a law firm with
an understanding that the company was to pay for costs the law
firm incurred on the company's behalf, including fees for
accountants.  The law firm hired accountants to work on the
company's case.  The company eventually terminated the law firm
and the accountants billed the law firm for its services and
costs.  When the law firm did not pay the bill, the accountants
sought payment from the company.  The company did not pay, and
the accountants brought an action against it, alleging breach of
contract, bad faith denial of contract, and quantum meriut.  The
jury found for the accountants, finding that the company had
breached the contract and had acted in bad faith.  The Supreme
Court reversed the judgment for the accountants on the claim of
bad faith denial of contract cause of action, specifically
overruling *Seaman's Direct Buying Service, Inc. v. Standard Oil*

*Co.*, 36 Cal.3d 752 (1984).  The Supreme Court held:

> [The] *Seaman's* decision should be overruled
> in favor of a general rule precluding tort
> recovery for noninsurance contract breach, at
> least in the absence of violation of 'an
> independent duty arising from principles of
> tort law' (*Applied Equipment, supra*, 7
> Cal.4th at p. 515) other than the bad faith
> denial of the existence of, or liability
> under, the breached contract.

Plaintiffs argue that the Complaint adequately alleges that
Defendants have breached an independent duty arising from
principles of tort law:

> [T]he legal duty owed to Plaintiffs and class
> members to disclose important material facts
> relating to the Option ARM loans (*e.g.* that
> (i) the payment amounts on the payment
> schedules in the TILDS provided to Plaintiffs
> and Class members were insufficient to pay
> both principal and interest; and (ii) if the
> payment schedule in the TILDS is followed,
> Plaintiffs and Class members will suffer
> negative amortization.

Plaintiffs' assertion, Defendants reply, that they may seek
a tort recovery for acts that might otherwise constitute a breach
of contract if those acts constitute breaches of a legal duty
independently arising under principles of tort law "may be true."
Defendants respond:

> [I]t does not aid plaintiffs on this motion.
> Whether Plaintiffs have a viable tort claim
> for fraud or fraudulent omission - that is
> breach of legal duties independently arising
> under tort law - is not an issue now before
> the Court.  All that Defendants now challenge
> is the breach of implied covenant which
> arises from contract, not tort principles,
> and so does not fall within the 'exception'
> plaintiffs cite.

In *Allied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7

49

Cal.4th 503 (1994), Allied Equipment Corp. entered into a subcontract with Defendant general contractor, which was involved in a general contract to provide military equipment to Saudi Arabia.  Plaintiff agreed to procure certain equipment from a manufacturer and, with the general contractor's approval, issued a purchase order for the equipment.  The general contractor subsequently decided to obtain some of the equipment directly from the manufacturer, thereby reducing the corporation's commission under the subcontract.  The corporation sued the general contractor and the manufacturer for breach of contract (the subcontract and the purchase order, respectively) and for tortious interference with those contracts.  Judgment was entered in favor of Plaintiff against both Defendants for contract damages for breach of, and tort damages for conspiracy to interfere with, the contracts.  Punitive damages were assessed against the general contractor.  The Supreme Court held that the manufacturer could not be liable for conspiring to interfere with its own contract.  In its holding the Supreme Court stated at page 515:

> Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law.  'The law imposes the obligation that 'every person is bound without contract to abstain from injuring the person or property of another, or infringing upon any of his rights.' (Sec. 1708, Civ. Code) This duty is independent of the contract ....
> "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."'

In *Erlich v. Menezes*, 21 Cal.4th 543 (1999), the Supreme Court explained:

>          Tort damages have been permitted in contract
>          cases where a breach of duty directly causes
>          physical injury ...; for breach of the
>          covenant of good faith and fair dealing in
>          insurance contracts ...; for wrongful
>          discharge in violation of fundamental public
>          policy ...; or where the contract was
>          fraudulently induced ... In each of these
>          cases, the duty arises from conduct which is
>          both intentional and intended to harm ....
>
>          ...
>
>          Generally, outside the insurance context, 'a
>          tortious breach of contract ... may be found
>          when (1) the breach is accompanied by a
>          traditional common law tort, such as fraud or
>          conversion; (2) the means used to breach the
>          contract are tortious, involving deceit or
>          undue coercion or; (3) one party
>          intentionally breaches the contract intending
>          or knowing that such a breach will cause
>          severe, unmitigable harm in the form of
>          mental anguish, personal hardship, or
>          substantial consequential damages.' ...
>          Focusing on intentional conduct gives
>          substance to the proposition that a breach of
>          contract is tortious only when some
>          independent duty arising from tort law is
>          violated ... If every negligent breach of a
>          contract gives rise to tort damages the
>          limitation would be meaningless, as would the
>          statutory distinction between tort and
>          contract remedies.

21 Cal.4th at 553-554.

In *Robinson Helicopter Co., Inc. v. Dana Corp.,* 34 Cal.4th 979 (2004), the Plaintiff Robinson manufactured helicopters using sprag clutches (a safety mechanism) produced by the Defendant Dana. Robinson was required to produce its helicopters within the exact specifications of the "type certificate" issued by the

FAA and any proposed changes in design would have to be approved by the FAA. One element of the type certificate was the exact grinding tolerances for the sprag clutches. For a period of years, Robinson purchased many sprag clutches from Dana that were ground to the proper specifications. However, at some point Dana changed the grinding process but did not notify Dana or the FAA. Nonetheless, Dana continued to provide written certificates to Robinson with each delivery of clutches that the clutches had been manufactured in conformance with Robinson's written specifications (which specifications prohibited unapproved changes in Dana's manufacturing process). Dana later switched back to the required specifications, again without notifying Robinson. *Id.* at 985-986. The sprag clutches manufactured during the period when Dana was not following the specifications experienced a higher failure rate than those properly manufactured. Although the increased failure in the clutches did not result in any accidents with the helicopters, Robinson was forced to recall the helicopters to replace the clutches. In order to recover the cost of replacement, Robinson sued Dana, alleging causes of action for breach of contract, breach of warranty and negligent and intentional misrepresentations. The jury found that Dana had made false misrepresentations of fact and had knowingly misrepresented or concealed facts with the intent to defraud. The California Court of Appeal applied the economic loss rule and found that Robinson could not recover in tort. The California Supreme Court, after citing *Erlich v.*

*Menezes*, held:

> By issuing false certificates of conformance, Dana unquestionably made affirmative representations that Robinson justifiably relied on to its detriment. But for Dana's affirmative misrepresentations by supplying the false certificates of conformance, Robinson would not have accepted delivery and used the nonconforming clutches over the course of several years, nor would it have incurred the cost of investigating the cause of the faulty clutches. Accordingly, Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of nonconforming clutches. In addition, Dana's provision of faulty clutches exposed Robinson to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA. Thus, Dana's fraud is a tort independent of the breach ....
>
> ...
>
> A breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by the breach. '"[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give them only such benefits as he expected to receive; this is the function of contract law."' ... However, '[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract.' ... No rational party would ever enter into a contract anticipating that they are or will be lied to. 'While parties, perhaps because of their technical expertise and sophistication, can

53

be presumed to understand and allocate the
risks related to negligent product design or
manufacture, those same parties cannot, and
should not, be expected to anticipate fraud
and dishonesty in every transaction.' ...
Dana's argument therefore proposes to
increase the certainty in contractual
relationships by encouraging fraudulent
conduct at the expense of an innocent party.
No public policy supports such an outcome.

Nor do we believe that our decision will open
the floodgates to future litigation.  Our
holding today is narrow in scope and limited
to a defendant's affirmative
misrepresentation on which a plaintiff relies
and which expose a plaintiff to liability for
personal damages independent of the
plaintiff's economic loss.  In addition,
'[i]n California, fraud must be pled
specifically; general and conclusory
allegations do not suffice ... "Thus, '"the
policy of liberal construction of the
pleadings ... will not ordinarily be invoked
to sustain a pleading defective in any
material respect."' ... This particularity
requirement necessitates pleading *facts* which
'show how, when, where, to whom, and by what
means the representations were tendered.'"'
... We trust the trial courts of this state
to enforce this pleading requirement.

*Id.* at 992-993.

These cases do not support a claim for tortious breach of

the implied covenant in this action.  The provisions of the

Promissory Note disclosed that the payment amounts on the payment

schedules in the TILDS provided to Plaintiffs may be insufficient

to pay both principal and interest and that, if the payment

schedule in the TILDS was followed, Plaintiffs will suffer

negative amortization.

Plaintiffs also contend that "these ongoing fraudulent

omissions - which Defendant used to secretly negatively amortize

54

Plaintiffs' and Class members' loans - prevented Plaintiffs and Class members from receiving the benefit of the Option ARM Loan Agreements." Plaintiffs cite *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400 (2000) that "[i]t has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"

However, as Defendants note, *Kransco* involved an insurance policy. *Kransco* continued:

> This principle applies equally to insurance policies, which are a category of contracts ... Because the covenant is a contract term, in most cases compensation for its breach is limited to contract rather than tort remedies ... But '[a]n exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that [an insurer's] breach of the implied covenant will provide the basis for an action in tort.' ... The availability of tort remedies in the limited context of an *insurer's* breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage.

Plaintiffs' reliance on *Kransco* ignores the case authority cited above that a claim for tortious breach of the implied covenant of good faith and fair dealing will not lie in the context of a commercial loan transaction. *Kransco* does no more than state a general contract law, not tort law. Further, Plaintiffs' contention that negative amortization was secret is belied by the

55

terms of the promissory note as well as the FRB's Consumer Handbook and the Loan Disclosure Statement.

Defendants' motion to dismiss the Sixth Cause of Action is GRANTED WITHOUT LEAVE TO AMEND. A claim for tortious breach of contract does not lie under California law in the absence of a special relationship with fiduciary characteristics. California case law is clear that a commercial loan transaction does not create such a special relationship. Plaintiffs' contentions that they are entitled to proceed with this cause of action because of allegations that Defendants' actions constituted breaches of a legal duty independently arising under principles of tort law is belied by the terms of the Promissory Note and other disclosures made in documents provided to Plaintiffs.

## CONCLUSION

For the reasons stated:

1. Defendants' motion to dismiss the Fifth and Sixth Causes of Action is GRANTED WITHOUT LEAVE TO AMEND;

2. Counsel for Defendants shall prepare and lodge a form of order consistent with this Memorandum Decision within five (5) court days of service of this Memorandum Decision.

IT IS SO ORDERED.

Dated:    March 30, 2009               /s/ Oliver W. Wanger
                                UNITED STATES DISTRICT JUDGE